RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0418p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RICHARD JOSEPH,

        *Petitioner-Appellant/*
        *Cross-Appellee,*

    Nos. 05-3111/3113

    *v.*

RALPH COYLE, Warden,

        *Respondent-Appellee/*
        *Cross-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00527—Lesley Wells, District Judge.

Argued: June 8, 2006

Decided and Filed: November 9, 2006

Before: MOORE, COLE, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Edmund W. Searby, SCOTT & SCOTT, Chagrin Falls, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Edmund W. Searby, Jennifer I. Cupar, SCOTT & SCOTT, Chagrin Falls, Ohio, for Appellant. Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. An Ohio jury convicted Richard Joseph of aggravated murder. The jury also convicted Joseph of a single capital specification, which made him eligible for the death penalty, and, after a mitigation hearing, recommended a sentence of death. The trial court accepted this recommendation and imposed the death penalty, which was upheld on direct and state post-conviction review. Asserting twenty grounds for relief, Joseph petitioned the district court for a writ of habeas corpus. The district court granted the writ on four grounds relating to a fundamental error in the capital specification: although the specification required Joseph to be the principal offender in the commission of the *aggravated murder*, everyone at trial proceeded under the mistaken view that the specification required Joseph to be the principal offender in the

1

commission of the *kidnapping*. The district court denied Joseph's remaining claims. Joseph appeals the denial of six of his sixteen unsuccessful claims, while the state cross-appeals the grant of the writ.

For the reasons discussed below, we **AFFIRM** the grant of a writ of habeas corpus.

## I. BACKGROUND

### A. Factual Background

Because this case turns not on factual disputes but on issues of law, we present the following account of the facts from the Ohio Supreme Court's decision:

> During the fall of 1989, . . . Joseph, began dating Cara M. Wireman. They began to date steadily until sometime in February 1990. Cara decided to end the relationship because she did not like the way [Joseph] treated her and she attended her senior prom with someone else. In April, Cara started dating the victim, Ryan Young, a student at the same high school. Ryan and [Joseph] knew each other from playing together on the school football team.
> Cara testified that [Joseph] was jealous of Ryan's relationship with her. [Joseph] wanted her to stop seeing Ryan so they could renew their relationship. This was evidenced by several letters [Joseph] wrote to Cara indicating his jealousy and desire to continue dating Cara. In one letter, he indicated he had been secretly watching Cara and Ryan together for three hours. Cara knew that martial arts played a big part in [Joseph's] life and she had previously seen him with guns and knives.
> On Monday, June 25, 1990, the day prior to the kidnapping, Cara and Ryan observed [Joseph] driving around in the area where Cara and Ryan both lived. Cara indicated she did not normally see [Joseph] driving in this area.
> On Tuesday, June 26, 1990, Ryan asked his mother if he could go to Cara's house, and he left around seven o'clock that evening driving his father's 1981 Oldsmobile. Ryan's mother received a telephone call from Ryan about 10:30 p.m. that evening and, during that conversation, she told him he could stay and finish watching the movie and then come straight home.
> Cara's next-door neighbor, Rose Fetter, was outside walking her dog at about 11:15 p.m. that night, when she observed a clean white car driving slowly down Thayer Road. There were two occupants in the car. Fetter indicated she first saw the car being driven north up Thayer Road. About ten minutes later she observed the car heading south on Thayer Road. The car pulled into a dirt driveway leading to property owned by a local kennel club and parked for a few minutes. Just prior to Fetter's going into her home she observed the car back out of the driveway and head north for a second time. Fetter testified she and her husband took care of the property for the kennel club and that she mowed around the driveway earlier in the day and did not observe any tire tracks at that time. However, the next morning she noticed there were tire tracks in the driveway.
> Ryan, Cara, and Cara's friend, Michelle Rumer, were at the same time watching the movie at Cara's house. The movie ended at approximately 11:30 p.m., at which time Michelle left to go home. Ryan stayed about fifteen or twenty minutes after Michelle left. Ryan and Cara walked out of Cara's house and into the driveway. As Ryan got into the car, Cara heard Ryan remark, "That looks like the White Cutlass that [Joseph] drives." Cara responded, "I doubt that. He wouldn't be out here." Ryan said, "I'm pretty sure that was him."
> Ryan was wearing a baseball hat turned backwards on his head that night. Cara saw Ryan back out onto Thayer Road into a position that would permit him to

drive north on Thayer. Just as Ryan backed onto the roadway, she saw the dome light in his car illuminate and heard a voice when the dome light came on. Cara also saw Ryan's head turn toward the passenger side door.

Cara went back into the house and watched television for about fifteen minutes. She decided to go to bed, so she went to shut the front door and saw the tail end of a white car drive by slowly heading south on Thayer Road. She saw the tail lights on the car and heard the brakes squeak. The subject car repeatedly turned around after passing Cara's residence and passed in front of her house approximately ten to twelve times. Cara testified the car matched the description of the car belonging to Bill Forest, a friend of [Joseph]. Cara testified [Joseph] and Jose Bulerin, [Joseph's] friend and roommate, often borrowed Forest's car. Cara became upset and called Michelle concerning the car that had passed in front of her house. At about 12:35 a.m., Cara called the residence shared by [Joseph] and Bulerin. She spoke with [Joseph's] cousin, April Joseph, who testified neither [Joseph] nor Bulerin was home to answer the call. Cara again called Michelle and talked for a while before calling [Joseph's] residence a second time at 1:00 a.m. [Joseph] and Bulerin still had not returned home.

Cara went to sleep and was awakened by a phone call from Ryan's mother, Sharon Young, at approximately 4:00 a.m. that morning. At about that time, Ryan's father, Rick Young, awoke and discovered that neither his son nor the car Ryan had been driving was home. The Youngs drove down Thayer Road toward Cara's house in search of their son. They found the 1981 Oldsmobile Cutlass Ryan had been driving abandoned just north of the bridge on Thayer Road. Rick entered the car and nothing apparently was out of place. The keys were still in the ignition and the car was still in gear. There were no indications of a robbery, as Ryan's wallet and money were, respectively, left on the seat and console tray of the car. A wet spot and char marks were found on the passenger seat of the car. The seat had not been wet or dirty the day before.

Inspector William Dailey took a material sample of a burnt log located across the road opposite from Cara's house on the morning of June 27, 1990. The inspector observed that the vegetation there was trampled down so that it led him to believe that someone may have been sitting in that area. The vegetation still had its color and the breaks in the leaves appeared to be fresh. He also took a sample of the blackened stain area on the front seat of Ryan's car for purposes of comparison with the burned log. Chemical analysis performed later revealed that the samples were consistent with one another.

The sheriff's department was notified and a search began. After talking with Cara, Deputy Gene King of the Allen County Sheriff's Office proceeded to [Joseph's] residence to question him concerning Ryan's disappearance. King arrived at [Joseph's] residence at approximately 5:10 a.m. on the morning Ryan was discovered missing and observed a white Cutlass in the driveway. King testified that the hood and radiator of the car were warm to the touch. There was also a dirty hand print on the trunk lid of the vehicle.

King spoke with [Joseph] and Bulerin. [Joseph] was hesitant to respond to questioning, as he persistently stared at the ground and his answers were invariably inaudible. The deputy testified that in spite of the early morning hour, [Joseph] did not appear to have been asleep. The deputy also noticed fresh blisters on [Joseph's] right hand.

[Joseph] was questioned both later that morning and about a week afterwards by law enforcement officers. [Joseph] disclaimed any knowledge of Ryan's disappearance. [Joseph] told the sheriff's detectives that on the day of the disappearance he reported to work at Frank's Car Wash. He then left with Forest to go to work at Indian Lake in Logan County. Forest testified that they had been

building a deck in order to install a hot tub adjacent to a house. [Joseph], Bulerin, and Forest were using Visqueen to cover up the deck to protect against the rain.

[Joseph] told detectives that the trio worked until about 6:30 p.m. before starting back to Lima to attend karate class. According to Forest, the karate class was taught by Bulerin with [Joseph] helping out as a co-instructor. [Joseph] and Bulerin then left karate class in Forest's car, the white Cutlass. Forest testified he left class with his girlfriend and did not see either [Joseph] or Bulerin again that night. [Joseph] and Bulerin went home, got cleaned up, and then left to get something to eat. [Joseph] stated that, afterwards, the pair drove around in Forest's car for several hours before returning home and going to bed at approximately 2:30 a.m. [Joseph] also stated that the brakes on Forest's car did squeak on that night.

Although Forest's car had new tires on it, Bulerin took Forest's car and changed the tires the day following Ryan's disappearance. Three of the tires that had been on Forest's car the night of Ryan's abduction were recovered by Detective Sergeant James Ketchum, who testified the tread pattern on one of the tires was similar to the tire prints found in the driveway to the kennel club located on Thayer Road.

Forest had kept a knife clipped to the sun visor in his car that was identical to another knife owned by a friend of his. The knife of Forest's friend was subsequently turned over to Lieutenant Van Horn by Forest for the investigation. Forest's knife had been in Forest's automobile on June 26, 1990; however, it had not been seen since. Forest testified that [Joseph] and Bulerin had used his car, had access to it, and traveled in it together frequently. [Joseph] and Bulerin also kept articles in his car, and he had observed a piece of material described as plastic, vinyl, or Visqueen and a shovel in his trunk. Forest had observed the same shovel before at [Joseph's] house. Forest also testified that he had watched a lot of movies with [Joseph] and Bulerin, many of which dealt with the martial arts. He also knew that [Joseph] had a black mask.

Monte Stinebuck worked at Frank's Auto Wash with [Joseph], Forest, and Bulerin. He testified that he saw [Joseph] and Bulerin on Thursday, June 28, 1990, and it was rainy that day. A discussion ensued regarding hauling some trash from the car wash and taking it to Joseph's Sand and Gravel Pit. They had never taken trash there before and the truck was loaded a quarter full.

Throughout the week following Ryan's disappearance, an extensive search was conducted. On July 4, 1990, the Allen County Sheriff's Department acted upon the information provided by Stinebuck and instituted a search at Joseph's Sand and Gravel Pit located in Auglaize County and owned by Joseph's grandparents. Mary Joseph, [Joseph's] grandmother, testified that she owned the sand and gravel pit and that [Joseph] was familiar with it, as he had spent a lot of time there growing up.

Ryan's body was discovered in a shallow grave. The body was wrapped in Visqueen, the jagged edge of which was matched positively with Visqueen recovered from the job site at Indian Lake where [Joseph] had been working. Under the body, a black ninja mask was recovered. An autopsy revealed that Ryan had superficial lacerations in the area of the throat. Further, Ryan had been stabbed two times in the back — one to the right flank and one at the base of the skull.

*State v. Joseph*, 653 N.E.2d 285, 287-90 (Ohio 1995), *cert. denied*, 516 U.S. 1178 (1996).

## B. Procedural Background

Joseph and Bulerin were jointly indicted for "purposely caus[ing] the death of another, to wit: Ryan R. Young, while committing or while fleeing immediately after committing kidnapping," 3 Joint Appendix ("J.A.") at 962 (Indictment), which is a type of aggravated murder. *See* OHIO REV.

CODE § 2903.01(B) (1987). The indictment contained an incorrect version of the capital specification of being the principal offender in the commission of the aggravated murder. *See id.* § 2929.04(A)(7). (Much more on this error below.) Joseph was tried alone before a jury,[1] which found him guilty of both the aggravated murder and the specification. In the penalty phase, the jury found that the aggravating circumstances outweighed the mitigating factors and recommended a sentence of death. After conducting an independent review, *see id.* § 2929.03(D)(3), the trial court accepted this recommendation and imposed a death sentence. Joseph's conviction and sentence were affirmed by both the Ohio Court of Appeals, *State v. Joseph* (*Joseph I*), No. 1-91-11, 1993 WL 531858 (Ohio Ct. App. Dec. 23, 1993) (unpublished opinion), and the Ohio Supreme Court, *State v. Joseph* (*Joseph II*), 653 N.E.2d 285 (Ohio 1995), and the United States Supreme Court denied certiorari, *Joseph v. Ohio*, 516 U.S. 1178 (1996). The Ohio courts denied postconviction relief. *State v. Joseph*, No. 1-96-90, 1997 WL 404252 (Ohio Ct. App. July 17, 1997) (unpublished opinion) (affirming denial of relief), *appeal denied*, 686 N.E.2d 276 (Ohio 1997) (table decision).

Asserting twenty grounds for relief, Joseph petitioned the district court for a writ of habeas corpus. In a thorough 218-page opinion and order, the district court determined four claims to be meritorious: (1) Joseph was denied due process because the capital specification included in the indictment was incorrect; (2) Joseph was denied due process because the jury instructions regarding the capital specification were incorrect; (3) Joseph was denied the effective assistance of counsel because his trial attorney failed to object to the flawed indictment and jury instructions and otherwise misunderstood the capital specification; and (4) Joseph's death sentence was imposed in the absence of a valid capital specification, in violation of the Eighth Amendment's narrowing requirement. Based on these claims, the district court issued the following order:

> [T]his Court issues a writ of habeas corpus ordering that Mr. Joseph's death sentence be set aside and that he be re-sentenced according to the statutory guidelines for aggravated murder in the absence of a capital specification, as set forth in O.R.C. § 2929.03(A), which mandates a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment. Unless Mr. Joseph is resentenced within 180 days from the effective date of this Order, the respondent shall release him from custody. On this Court's own motion, execution of this Order and hence, its effective date, is stayed pending appeal by the parties.

2 J.A. at 831 (Dist. Ct. Memo. of Op. & Order at 218). The district court rejected the remaining sixteen grounds for relief, but it issued a certificate of appealability as to all issues. Joseph now appeals the denial of six of the sixteen claims rejected by the district court: two of these attack the sufficiency of the evidence of the capital specification, while the remaining four challenge the aggravated murder conviction. The state cross-appeals the issuance of the writ.

## II. STANDARD OF REVIEW

We review de novo a district court's decision to grant or deny a petition for a writ of habeas corpus. *Burton v. Renico*, 391 F.3d 764, 770 (6th Cir. 2004), *cert. denied*, — U.S. —, 126 S. Ct. 353 (2005). Because Joseph filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its provisions apply to his case. *Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

---

[1] Bulerin was tried separately before a three-judge panel, which convicted him of both the aggravated murder and the capital specification. The panel found that the aggravating circumstances did not outweigh the mitigating factors, so Bulerin was sentenced to life imprisonment. *State v. Bulerin*, No. 1-91-24, 1992 WL 136182, at *1 (Ohio Ct. App. June 11, 1992) (unpublished opinion).

Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a "claim that was adjudicated on the merits in State court proceedings" if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).**2** A state-court decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state-court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *id.* at 407-08, or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context," *Seymour v. Walker*, 224 F.3d 542, 549 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001); *see also Ramdass v. Angelone*, 530 U.S. 156, 166 (2000) (plurality opinion).

As the text of the statute makes clear, however, § 2254(d)(1)'s limits on habeas relief apply only if there is a state-court "adjudicat[ion] on the merits" of a given claim. For reasons we discuss at greater length in Part IV.C, Joseph's *Brady* claim was not "adjudicated on the merits in State court proceedings" and therefore is not governed by the strictures of § 2254(d)(1). Joseph's remaining claims were, however, "adjudicated on the merits" by the state courts, so § 2254(d)(1)'s limits apply. For each of these claims, the decision we review is that of "the last state court to issue a reasoned opinion on the issue." *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005), *cert. denied*, — U.S. —, 2006 WL 732193 (U.S. June 26, 2006) (No. 05-9829); *see also, e.g.*, *Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("[A] federal court reviewing a habeas petition should examine the decision of the last state court to rule on the merits of the issue."), *cert. denied*, 538 U.S. 1057 (2003); *Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) ("This court . . . must look to the last reasoned decision of the state court as the basis of the state court's judgment."); *Barrientes v. Johnson*, 221 F.3d 741, 779 (5th Cir. 2000) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter." (internal quotation marks omitted)), *cert. dismissed*, 531 U.S. 1134 (2001). For Joseph's indictment, jury-instruction, and sufficiency-of-the-evidence claims, the last reasoned decision is that of the Ohio Supreme Court. With respect to the *Miranda*, pretrial-publicity, prosecutorial-misconduct, ineffective-assistance, and Eighth Amendment claims, which the Ohio Supreme Court declined to address, the last reasoned decision is that of the Ohio Court of Appeals.

### III. CLAIMS RELATING TO THE CAPITAL SPECIFICATION

Joseph attacks his death sentence on several grounds, arguing that the state violated his constitutional rights under the Due Process Clause (in three different ways), the Sixth Amendment, and the Eighth Amendment. Yet the facts underlying these claims are really just variations on the same theme: every participant in the trial — the prosecution, Joseph's counsel, the trial judge, and the jurors — operated under a mistaken view of the single capital specification with which Joseph was charged. Thus, before addressing Joseph's individual claims, we present the following brief summary of the specification and how it was misconstrued during the state proceedings.

Ohio law makes a defendant convicted of aggravated murder eligible for the death penalty only if one or more specifications is included in the indictment and proved beyond a reasonable

---

**2** A habeas petition may also be granted if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), but this avenue of relief is not relevant to the instant case.

doubt.**[3]** OHIO REV. CODE ANN. § 2929.04(A) (1987); *see also id.* § 2929.03(A). The statutory text of the capital specification at issue in this case provides in relevant part:

> The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit *kidnapping*, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the *principal offender in the commission of the aggravated murder* or, if not the principal offender, committed the aggravated murder with prior calculation and design.

*Id.* § 2929.04(A)(7) (italics and underline added). As will be discussed further below, the Ohio Supreme Court has interpreted the element of being "the principal offender in the commission of the aggravated murder" to mean that the defendant "actually killed" the victim.

Joseph's indictment included the following specification:

> The Grand Jurors further find and specify that the offense was committed while the offenders were committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, and the offenders were the *principal offenders in the commission of the kidnapping* . . . .

3 J.A. at 962 (Indictment) (italics and underline added).**[4]** To be explicit, the indictment substituted the word "kidnapping" in place of the word "aggravated murder" in the "principal offender" phrase. Thus, although the statute requires that the defendant be the principal offender in the commission of the *aggravated murder*, Joseph's indictment alleged that Joseph was the principal offender in the commission of the *kidnapping*. In other words, the indictment's version of the capital specification did not include the critical requirement that Joseph "actually killed" the victim. Joseph's counsel did not object to the error in the indictment.

During the guilt-phase trial, counsel for both the state and Joseph adopted the indictment's mistaken formulation of the specification. In its opening statement, the state said the following:

> This case is an aggravated murder case with a specification of *kidnapping*. That makes it a capital case. The State of Ohio needs to prove to you folks that Jose Bulerin and Richard Joseph jointly purposely caused the death of another, to wit: Ryan R. Young, while committing or while fleeing immediately after committing *kidnapping*. The State of Ohio needs to prove these elements beyond a reasonable doubt.

8 J.A. at 3107-08 (Trial Tr. at 1201-02) (emphases added). Thus, in explaining the specification that it "need[ed] to prove" in order to "make[] it a capital case," the state mentioned the kidnapping element but omitted the requirement that Joseph be the principal offender in the commission of the

---

**[3]** The specification(s) must be made "pursuant to section 2941.14." OHIO REV. CODE ANN. § 2929.04(A) (1987). Section 2941.14 provides in relevant part:

> A specification to an indictment . . . charging aggravated murder shall be stated at the end of the body of the indictment . . . , and may be in substantially the following form:
> "*Specification* . . . . The Grand Jurors further find and specify that (set forth the applicable aggravating circumstance listed in divisions (A)(1) to (8) of section 2929.04 of the Revised Code. The aggravating circumstance may be stated in the words of the subdivision in which it appears, or in words sufficient to give the accused notice of the same)."

*Id.* § 2941.14(C).

**[4]** The indictment did not allege the "prior calculation and design" prong of the statutory specification.

aggravated murder. The state referred to "a specification of *kidnapping*" again in its rebuttal. 11 J.A. at 3980 (Trial Tr. at 2049) (emphasis added).

The state's failure to understand the specification was perhaps most evident in the following part of its closing argument:

> Another thing the State of Ohio doesn't know and can't tell you, and it doesn't make any difference as long as you find the two people, Jose Bulerin and Richard E. Joseph, jointly committed these crimes, or this crime, the law is very clear in Ohio that if one person is an aider and abetter, no matter what part he has in it, if he plays a part in the commission of that crime then he's as guilty as the other guy. The State of Ohio can't tell you. I wish I could. I wish I could tell you exactly what happened. I don't know who struck the death blow. But, I believe the evidence is very clear that it was one of the two that's charged here. If you find one of them did it, or the other one did it, they're both just as guilty as if each of them had their hands around the hilt of that knife when it was stuck in Ryan Young.

11 J.A. at 3907 (Trial Tr. at 1976). The state made the same point in its rebuttal: "We don't have to show that this defendant was the one who administered the fatal blows. He was with him. We don't know which one did it. We don't have to prove that." 11 J.A. at 3973 (Trial Tr. at 2042). In other words, the state conceded that it could not prove that Joseph actually killed Young, but it also erroneously told the jury that this shortcoming did not matter. Joseph's counsel did not object to any of these statements by the state. In fact, Joseph's counsel made the same mistake in his own opening statement and closing argument, referring to the "specification of *kidnapping*" without mentioning the principal-offender-in-the-aggravated-murder (i.e., actual-killer) requirement. 9 J.A. at 3128, 3130, 3963 (Trial Tr. at 1222, 1224, 2032) (emphasis added).

The incorrect specification also found its way into the trial court's instructions to the jury at the close of the guilt phase. The court incorrectly described the specification as requiring that Joseph be "the principal offender[] in the commission of the *kidnapping*." 11 J.A. at 3998 (Trial Tr. at 2067) (emphasis added). On several other occasions, the court did not explicitly recite the incorrect specification, but it referred to the specification *in the indictment*, which was, of course, independently incorrect as discussed above. 11 J.A. at 3996-97, 4003, 4004 (Trial Tr. at 2065-66, 2072, 2073). The court also once read from the verdict form, which included a correct version of the specification. 11 J.A. at 4005-06 (Trial Tr. at 2074-75). At no point did the court instruct the jury that the principal-offender provision of the specification requires that the defendant "actually killed" the victim.[5] Joseph's counsel did not object to the incorrect aspects of the jury instructions.

The penalty phase also saw numerous instances of the erroneous capital specification. The trial court began the mitigation hearing by reminding the jury that it had found Joseph guilty of the specification and instructing them that this specification was the only aggravating circumstance. In doing so, the court read the incorrect version of the specification, using the phrase "principal offender[] in the commission of the *kidnapping*." 11 J.A. at 4069 (Mitigation Tr. at 26) (emphasis added). The state equated the aggravating circumstance with kidnapping in both its closing and

---

**5** Instead, the court simply said that "[a] principal offender or offenders is defined as that person or persons primarily responsible for the alleged illegal conduct involved." 11 J.A. at 3998 (Trial Tr. at 2067). This instruction obviously does not clarify that the relevant "illegal conduct" is the murder, not the kidnapping. Thus, the instruction is even vaguer than one that the Ohio Supreme Court has held to be insufficient. *See State v. Skatzes*, 819 N.E.2d 215, 240-41 (Ohio 2004) (deeming erroneous a principal-offender instruction that the defendant "ha[d] hands-on involvement *in a homicide*" (emphasis added)).

rebuttal arguments.**6** 11 J.A. at 4333 (Mitigation Tr. at 282); 12 J.A. at 4366, 4371 (Mitigation Tr. at 315, 320). In its instructions to the jury at the close of the penalty phase, the court read the correct version of the specification. 12 J.A. at 4377 (Mitigation Tr. at 326). However, the court also referred to the specification *in the indictment*, which was, of course, incorrect. 12 J.A. at 4375 (Mitigation Tr. at 324). Moreover, throughout its instructions, the court consistently used some version of the phrase "the aggravating circumstance which the defendant was found guilty of committing" (during the guilt phase). 12 J.A. at 4371-72, 4373, 4374, 4377, 4380 (Mitigation Tr. at 320-21, 322, 323, 326, 329). This phrase was also used in the verdict forms, which the court read to the jury. 12 J.A. at 4381-82 (Mitigation Tr. at 330-31). Thus, the jury instructions and the verdict form implicitly incorporated the erroneous version of the specification that had been repeatedly invoked during the guilt phase. Joseph's counsel did not object to either the court's or the state's statements. Instead, Joseph's counsel himself referred to the aggravating circumstance as kidnapping — three times during his opening statement, 11 J.A. at 4073-74 (Mitigation Tr. at 30-31), and twice during his closing argument, 12 J.A. at 4353-54 (Mitigation Tr. at 302-03).

Finally, during the trial court's independent review of the jury's death-penalty recommendation, *see* OHIO REV. CODE ANN. § 2929.03(D)(3) (1987), both Joseph's counsel and the court referred to the aggravating circumstance of kidnapping.**7** 12 J.A. at 4411, 4412, 4414, 4416 (Mitigation Tr. at 360, 361, 363, 365).

## A. Sufficiency of the Evidence

We first address Joseph's sufficiency-of-the-evidence claim. *See, e.g.*, *United States v. Aarons*, 718 F.2d 188, 189 n.1 (6th Cir. 1983) ("Where the sufficiency of the evidence is properly before us, we consider that issue first because it is determinative of whether the appellant may be retried."). In a due-process challenge to the sufficiency of the evidence, clearly established Supreme Court precedent provides that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Joseph argues that the state court unreasonably applied *Jackson* in that there was no evidence of the critical element of the capital specification: being the principal offender in the commission of the aggravated murder. In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). Thus, we turn to the Ohio courts' definition of the capital specification at issue here.

As we have already noted, the correct version of the single capital specification with which Joseph was charged requires the defendant to be "the principal offender in the commission of the aggravated murder." OHIO REV. CODE ANN. § 2929.04(A)(7) (1987). The Ohio Supreme Court has consistently interpreted this element to require the defendant to be "the actual killer." *State v. Taylor*, 612 N.E.2d 316, 325 (Ohio 1993); *State v. Wiles*, 571 N.E.2d 97, 122 (Ohio 1991), *cert. denied*, 506 U.S. 832 (1992); *State v. Penix*, 513 N.E.2d 744, 746 (Ohio 1987); *see also Mitchell v.*

---

**6** In its closing argument, the state used the correct phrase, "principal offender in the commission of the aggravated murder." 11 J.A. at 4333 (Mitigation Tr. at 282). However, immediately before using this language, the state referred to the "aggravating circumstance . . . set out in the indictment," and immediately afterward it said, "[y]ou need in your deliberations to think about the evidence that you heard involving the kidnapping and weigh that with the mitigation evidence that you heard." *Id.* Thus, we count the overall statement as another erroneous recitation of the specification/aggravating circumstance.

**7** Without elaboration, the state simply asked the court to follow the jury's recommendation. 12 J.A. at 4411 (Mitigation Tr. at 360). Thus, it did not have the opportunity to repeat the erroneous version of the specification/aggravating circumstance.

*Esparza*, 540 U.S. 12, 18 (2003) (acknowledging this interpretation). Other formulations of "actual killer" are that the defendant "personally performed every act constituting the offense of aggravated murder," *State v. Sneed*, 584 N.E.2d 1160, 1168 (Ohio 1992), *cert. denied*, 507 U.S. 983 (1993); *see also State v. Goodwin*, 703 N.E.2d 1251, 1264-65 (Ohio) (approving a similar instruction), *cert. denied*, 528 U.S. 846 (1999); *State v. Getsy*, 702 N.E.2d 866, 884 (Ohio 1998) (same), *cert. denied*, 527 U.S. 1042 (1999), or "directly caused the death," *State v. Stallings*, 731 N.E.2d 159, 173 (Ohio 2000), *cert. denied*, 534 U.S. 836 (2001). However, it is not enough that the defendant simply "ha[d] hands-on involvement in a homicide." *State v. Skatzes*, 819 N.E.2d 215, 240-41 (Ohio 2004); *see also State v. Skatzes*, No. 15848, 2003 WL 24196406, at *40 (Ohio Ct. App. Jan. 31, 2003) (unpublished opinion) (explaining that it is not enough for the defendant to be "an escort or a mere provider of a weapon.").

There have been many cases where the evidence has been sufficient to show that the defendant was the actual killer. When the victim died of gunshot wounds, there was evidence that the defendant fired the shots. *See, e.g.*, *State v. Jackson*, 839 N.E.2d 362, 370, 377 (Ohio 2006); *State v. Noling*, 781 N.E.2d 88, 96-97, 105 (Ohio 2002), *cert. denied*, 539 U.S. 907 (2003); *State v. Gross*, 776 N.E.2d 1061, 1073, 1093 (Ohio 2002), *cert. denied*, 538 U.S. 1037 (2003); *State v. Yarbrough*, 767 N.E.2d 216, 241 (Ohio), *cert. denied*, 537 U.S. 1023 (2002); *Stallings*, 731 N.E.2d at 173; *State v. Chinn*, 709 N.E.2d 1166, 1177 (Ohio 1999), *cert. denied*, 528 U.S. 1120 (2000). When the victim died of head trauma, there was evidence that the defendant struck the blows. *See Skatzes*, 819 N.E.2d at 231-32, 241. When the victim died of knife wounds, there was evidence that the defendant stabbed the victim. *See State v. Stojetz*, 705 N.E.2d 329, 337 (Ohio), *cert. denied*, 528 U.S. 999 (1999). Thus, the Ohio Supreme Court has consistently interpreted the principal-offender/actual-killer element to mean that the defendant personally inflicted the death blow(s).[8]

In rejecting Joseph's *Jackson* claim, the Ohio Supreme Court cited the following evidence. *Joseph II*, 653 N.E.2d at 293. First, there was evidence of motive, as Joseph was jealous of the relationship between Wireman and Young. Second, Joseph admitted that he and Bulerin were out driving Forest's white Cutlass on the night of the murder, and a matching vehicle was seen near Wireman's house. Third, Young's body was found buried on Joseph's grandparents' property, wrapped in material (Visqueen) available to Joseph, near a mask like one owned by Joseph. Fourth, "[Young] suffered two stab wounds, either of which could have been fatal, and the knife always kept in the car was missing the morning of the disappearance." The state points to no additional evidence in its briefs before this court, and there is none apparent in the record.

It is immediately apparent, however, that *none* of this evidence shows that Joseph personally inflicted either stab wound. This fact does not present an obstacle to conviction in a case where the defendant was the only person either present when the victim was murdered or otherwise involved in the crime, the logic being that he is the only person who could have actually committed the murder. But when the defendant and a coconspirator are present at the time and place of the murder, there must be evidence showing that the defendant struck the fatal blow(s). *See State v. Cunningham*, 824 N.E.2d 504, 512, 531 (Ohio 2004), *cert. denied*, — U.S. —, 126 S. Ct. 110 (2005); *Taylor*, 612 N.E.2d at 325.

All indications are that Joseph was neither alone with Young on the night of the murder nor the only person involved in the crime; Bulerin was both present and involved in other ways. Indeed, the very evidence cited by the Ohio Supreme Court to implicate Joseph also implicates Bulerin. The evidence that placed Joseph at the scene (witnesses saw Forest's car in front of Wireman's home) also put Bulerin at the scene, as the two men were driving around together in Forest's car the night

---

[8] This proposition is consistent with the fact that there may be multiple principal offenders corresponding to multiple fatal blows. *See Stojetz*, 705 N.E.2d at 337; *State v. Keene*, 693 N.E.2d 246, 256 (Ohio), *cert. denied*, 525 U.S. 936 (1998).

of Young's disappearance and murder.[9] *Joseph II*, 653 N.E.2d at 289. The fact that Young's body was wrapped in Visqueen implicates Bulerin as well as Joseph, as both had access to the material. *Id.* at 289. And the fact that Young's body was discovered on Joseph's grandparents' property also implicates Bulerin as well as Joseph, as two days after the murder, both men talked to a coworker about hauling trash to that property. *Id.* at 290. There was other evidence of Bulerin's involvement, too: both Joseph and Bulerin often borrowed Forest's car and kept items in it, *id.* at 288, 289, and Bulerin changed the tires of Forest's car the day after Young's disappearance even though they were new, *id.*

There was also evidence that Joseph and Bulerin, who shared a residence, *id.* at 288, were close. As Chief Justice Moyer demonstrated in dissent, their relationship supplied Bulerin with ample motive to kill Young:

> [T]estimony was presented that the co-defendant Bulerin . . . was highly involved with martial arts, and protective of "his kid" (Joseph). Forest confirmed that Bulerin had indicated that he would "either snap your neck or put a bullet through your head and throw you out alongside the road" if you ever "screwed with or messed with" him or Joseph. Joseph's mother testified that, on one occasion when her son was ill, Bulerin told her not to "waste [her] time" in attempting to take Joseph home with her because she "wasn't going to get [her] son." She testified that Bulerin had threatened to break into her home and take something, or kill her dogs. At Joseph's mitigation hearing, Bulerin's ex-wife testified that, while she could not believe Joseph actually killed Young, she could believe that behavior of Bulerin.

*Id.* at 301 (Moyer, C.J., dissenting) (second and third alterations in original).[10] In light of all this evidence connecting both Joseph and Bulerin to the murder, it is not surprising that the two men were jointly indicted. *Id.* at 290. Indeed, the state's entire theory of the case was that the two acted together.

Of course, the evidence of Bulerin's presence at the scene and other involvement does not rule out the possibility that Joseph was the actual killer. It means, however, that actual killing cannot be attributed to Joseph simply because he was involved and present at the scene. *See Cunningham*, 824 N.E.2d at 512, 531; *Taylor*, 612 N.E.2d at 325. Because either of the two knife wounds in Young may have been fatal, the state had to prove that Joseph personally inflicted at least one of the wounds, but it offered no evidence of this whatsoever. In fact, the state conceded this very point during its closing argument: "The State of Ohio can't tell you. I wish I could. I wish I could tell you exactly what happened. I don't know who struck the death blow." 11 J.A. at 3907 (Trial Tr. at 1976). Thus, the evidence showed *at most* that Joseph "ha[d] hands-on involvement in a homicide," *Skatzes*, 819 N.E.2d 215, 240-41, which is insufficient to prove that he was the actual killer.

In light of the clear line of precedent requiring proof that Joseph was the actual killer, the equally clear precedent that the actual-killer element requires proof that the defendant personally inflicted the death blows in a situation where (as here) the defendant and a coconspirator are both present at the scene, and the total absence of such proof (accompanied by the state's concession that

---

[9] As we discuss below in the context of the *Brady* claim, there was also evidence that Forest was with Joseph and Bulerin that night. However, because the state failed to disclose this evidence, it was not before the jury, so we do not consider it here.

[10] Acting Justice Deshler and Justice (now U.S. Circuit Judge) Cook agreed with Chief Justice Moyer's sufficiency analysis, making the vote 4-3 on this issue.

it could not offer such proof, to boot), we conclude that the Ohio Supreme Court's decision was an unreasonable application of the due-process standard of *Jackson v. Virginia*.[11]

## B.  Eighth Amendment Narrowing Requirement

Joseph also claims that his death sentence violates the Eighth Amendment, which forbids the infliction of "cruel and unusual punishments."  U.S. CONST. amend. VIII.  Specifically, Joseph contends that because he was not properly convicted pursuant to a correct capital specification, his death sentence fails to satisfy the Eighth Amendment's narrowing requirement.  The Supreme Court has summarized this requirement as follows:

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983); cf. *Gregg v. Georgia*, 428 U.S. 153 (1976).  Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. *Id.*, at 162-164 (reviewing Georgia sentencing scheme); *Proffitt v. Florida*, 428 U.S. 242, 247-250 (1976) (reviewing Florida sentencing scheme).  By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. *Zant*, *supra*, 462 U.S., at 878 ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition:  they circumscribe the class of persons eligible for the death penalty").

*Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988).  The Ohio Court of Appeals, which was the last state court to issue a reasoned opinion on the issue, rejected Joseph's claim because it concluded that the jury had properly found Joseph guilty of the principal-offender specification. *Joseph I*, 1993 WL 531858, at *23-*24.

We recently granted habeas relief on the basis of a violation of the Eighth Amendment narrowing requirement.  In *Esparza v. Mitchell* (*Esparza I*), 310 F.3d 414 (6th Cir. 2002), we reviewed an Ohio conviction in which a death sentence was imposed even though the indictment did not charge a capital specification, the trial court did not instruct the jury on a capital specification, and the jury did not return a verdict on a capital specification. *Id.* at 416.  Instead, "the state courts, on their own initiative, after the jury trial and verdict, found the petitioner Esparza guilty of the [specification] that made him eligible for the death penalty, i.e., being the 'principal offender' in committing an aggravated murder while committing a robbery."[12] *Id.* at 417.  We concluded that imposing a death sentence even though "the jury never found the statutorily required [capital specification] . . . . is unquestionably a violation of the Eighth Amendment." *Id.* at 420.  We further held that the Eighth Amendment error was not subject to harmless-error analysis. *Id.* at 421-22.

The thrust of Joseph's argument is that his case is materially indistinguishable from *Esparza I*.  We agree.  Given the pervasive misunderstanding of the capital specification at Joseph's trial, it is clear that Joseph's death sentence was imposed pursuant to a jury verdict that he was "the principal offender in the commission of the kidnapping" rather than a jury verdict that he was "the

---

[11] In support of his *Jackson* claim, Joseph also argues that there was insufficient evidence of another element of the capital specification:  that the aggravated murder occurred in relation to a kidnapping.  Because we have already concluded that there was insufficient evidence of the principal-offender element of the capital specification, we need not address the sufficiency of the kidnapping element.

[12] Note that this was the same specification — § 2929.04(A)(7) — at issue in the instant case.

principal offender in the commission of the aggravated murder." In other words, Joseph's death sentence was imposed pursuant to a jury finding of an invented-on-the-fly capital specification that does not exist in Ohio's statutory code rather than a jury finding of the statutory capital specification in OHIO REV. CODE § 2929.04(A)(7). As in *Esparza I*, "the jury never found the statutorily required [capital specification]," so the imposition of the death penalty "is unquestionably a violation of the Eighth Amendment." 310 F.3d at 420.

We recognize, of course, that the Supreme Court reversed *Esparza I*. *See Mitchell v. Esparza* (*Esparza II*), 540 U.S. 12 (2003). Yet that reversal was in response to our holding that the Eighth Amendment violation was not subject to harmless-error analysis. *See Esparza II*, 540 U.S. at 16-17. The Supreme Court did *not* disturb our conclusion that a constitutional violation occurred. Thus, we follow *Esparza I*'s Eighth Amendment analysis and conclude that the narrowing requirement was violated here.

We now turn to the harmless-error analysis mandated by the Supreme Court in *Esparza II*. The Court's analysis in that case is instructive. The Court reasoned that the jury "would surely have" returned a guilty verdict on a principal-offender specification because Esparza "was the only defendant charged in the indictment" and "[t]here was no evidence presented that anyone other than [Esparza] was involved in the crime or present at the [scene of the murder]." *Esparza II*, 540 U.S. at 18. Thus, the state court's conclusion that the errors were harmless was not objectively unreasonable under AEDPA. *Id.* at 19; *accord Biros v. Bagley*, 422 F.3d 379, 388 (6th Cir. 2005) (stating in dictum that an Eighth Amendment violation was harmless because it was undisputed that the petitioner acted alone), *cert. denied*, 75 U.S.L.W. 3167 (U.S. Oct. 2, 2006) (No. 05-11394). Both factors in the Court's analysis cut the other way here: another person (Bulerin) was charged in the indictment, and there was significant evidence that another person (Bulerin) was involved in the crime and present at the scene of the murder. Thus, *Esparza II* itself strongly supports the conclusion that the Eighth Amendment error was *not* harmless in the instant case.

Accordingly, we conclude that the state court unreasonably applied clearly established federal law in concluding that Joseph's sentence satisfied the Eighth Amendment narrowing requirement.

## C. Flawed Indictment, Erroneous Jury Instructions, and Ineffective Assistance of Counsel

In addition to the *Jackson* claim already discussed above, Joseph argues that his due process rights were violated in two other ways: by being tried pursuant to an indictment and jury instructions that incorrectly stated the only capital specification with which he was charged. Joseph did not, however, object at trial to either the indictment or the jury instructions. Accordingly, the Ohio Supreme Court deemed these claims waived and reviewed only for plain error. *Joseph II*, 653 N.E.2d at 291, 294. We recently held in similar circumstances that a prisoner had procedurally defaulted his claims. *See Biros*, 422 F.3d at 386-87. Thus, Joseph has procedurally defaulted his indictment and jury-instruction claims, and "federal habeas review of the claims is barred unless [Joseph] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### 1. Cause and Prejudice/Ineffective Assistance of Counsel

We note at the outset that "[s]o confident is the government of the correctness of its [cause-and-prejudice] argument that it has not deigned to respond to the merits of the appeal. This was a tactical error. The government's confidence is unwarranted." *Pasha v. Gonzales*, 433 F.3d 530, 532 (7th Cir. 2005). For the following reasons, Joseph has established cause and prejudice to excuse his procedural default.

Constitutionally "[i]neffective assistance of counsel . . . is cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do . . . ; the assistance must have been so ineffective as to violate the Federal Constitution. In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." (citation omitted)). Joseph argues that his procedural default should be excused because his trial counsel provided constitutionally ineffective assistance by failing to object to the flawed indictment and erroneous jury instructions. Joseph also claims the ineffective assistance of counsel ("IAC") as an independent claim for habeas relief.[13] Although Joseph must satisfy the AEDPA standard with respect to his independent IAC claim, he need not do so to claim ineffective assistance for the purpose of establishing cause. *See Fischetti v. Johnson*, 384 F.3d 140, 154-55 (3d Cir. 2004). For the reasons discussed below, Joseph has established his IAC claim under the AEDPA standard, which necessarily means that he has also established ineffective assistance for the purpose of establishing cause.

IAC claims are governed by the test enunciated in the clearly established Supreme Court precedent of *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Performance is measured against "an objective standard of reasonableness," "under prevailing professional norms." *Id.* at 688. The second component of a *Strickland* claim is a "show[ing] that the deficient performance prejudiced the defense." *Id.* at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is less than a preponderance of the evidence, as "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Instead, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Ohio Court of Appeals, which was the last state court to issue a reasoned opinion on the issue, gave the following reasons for rejecting the argument that Joseph's counsel was ineffective for failing to object to the flawed indictment and erroneous jury instructions:

> The flaw in the specification is very technical in nature, albeit the effect of this flaw has been an issue of significant importance to the case. This flaw in the precise wording of the specification was so subtle that neither the attorneys for the State nor the trial judge noticed it. Defense counsel's failing to notice this flaw does not rise to the level of deficient performance.
>
> . . .
>
> . . . Simply failing to object to an alleged error is insufficient to sustain a claim of ineffective assistance of counsel, unless it is also shown that counsel violated an essential duty owed the client. The [failure to object to the jury instructions] do[es] not amount to deficient conduct resulting in prejudice affecting the fairness of [Joseph's] trial.

---

[13] It is undisputed that Joseph presented this independent claim to the Ohio courts. He has therefore satisfied the "general[] require[ment] that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Carrier*, 477 U.S. at 489.

*Joseph I*, 1993 WL 531858, at *26.**[14]**

A number of recent cases have emphasized that defense attorneys have a constitutional duty to conduct adequate factual investigations. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003). Yet it can hardly be doubted that defense lawyers have a constitutional obligation to investigate and understand the *law* as well. *See, e.g.*, *Williams*, 529 U.S. at 395 (noting that counsel "failed to conduct an investigation . . . not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."); *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after *thorough investigation of law* and facts relevant to plausible options are virtually unchallengeable . . . ." (emphasis added)); *Smith v. Dretke*, 417 F.3d 438, 442-43 (5th Cir. 2005) ("[Defense counsel] failed to achieve a rudimentary understanding of the well-settled law of self-defense in Texas. By doing so, he neglected the central issue in his client's case. . . . This misunderstanding could have been corrected with minimal legal research." (footnote omitted)).

Here, the principal-offender specification was the *only* capital specification with which Joseph was charged and therefore was the only reason Joseph faced the death penalty. Thus, it was obviously *the* critical issue in the case. Simply reading the statute would have revealed that the specification requires the defendant to be the principal offender in the commission of the aggravated murder, not of the kidnapping. And minimal case research would have revealed that being the principal offender in the commission of the aggravated murder means that the defendant must have "actually killed" the victim. Yet Joseph's trial counsel failed to grasp either of these two basic points, as evidenced by his failure to object to the flawed indictment and erroneous jury instructions. The complete lack of understanding was further confirmed by counsel's own repeated misstatements of the specification. And it was topped off by his failure to notice that the state conceded that it could not prove that Joseph actually killed the victim.

Understanding the elements of the specification that makes a defendant eligible for the death penalty is perhaps the most basic aspect of representing a capital defendant. We think this proposition obvious, but in any event it finds support in "the standards for capital defense work articulated by the American Bar Association (ABA) — standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable.'" *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688). The ABA Guidelines provide that "[c]ounsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES § 11.4.1(A) (1989). Counsel must procure "[s]ources of investigative information," the first of which are the "charging documents," which "should be obtained and examined in the context of the applicable statutes and precedents, to identify . . . the elements of the charged offense(s), including the element(s) alleged to make the death penalty applicable . . . ." *Id.* § 11.4.1(D)(1)(A).**[15]** In failing to understand even the basic elements of the principal-offender specification, the performance of Joseph's trial counsel was constitutionally deficient.

---

**[14]** The state court appears to have (briefly) addressed both *Strickland* prongs with respect to the failure to object to the jury instructions, but only the performance prong with respect to the failure to object to the indictment. Thus, the AEDPA standard applies to these analyses but not to the *Strickland* prejudice issue with respect to the failure to object to the indictment. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003). Nevertheless, because Joseph's claim succeeds under either de novo or AEDPA review, for the sake of simplicity we conduct the entire analysis under the § 2254(d)(1) standard.

**[15]** The most recent version of the ABA Guidelines is substantially similar. *See* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES § 10.7(A) & cmt. (rev. ed. 2003).

The state court attempted to diminish the failures of Joseph's counsel by calling the error in the specification "technical" and "subtle." We think it inconceivable that a reasonable criminal defense attorney would find the difference between "kidnapping" and "aggravated murder" too technical and subtle, especially when this distinction provides the sole basis for receiving the "death penalty" rather than a "life sentence." Under the state court's unreasonably low performance standard, criminal defense lawyers might also be permitted to confuse "misdemeanor" and "felony," the "Fourth" and "Fifth" Amendments, or even "guilty" and "not guilty." Fortunately for Joseph and other criminal defendants, the prevailing professional norms under which *Strickland* performance is judged are not as low as the state court would have them.

The state court also attempted to minimize the deficiency of Joseph's counsel by noting that he was not the only one to misunderstand the specification — the prosecution and the trial judge similarly erred. We fail to see how the pervasiveness of the error excuses Joseph's counsel's performance. After all, Joseph was represented — and consequently was owed a constitutionally sufficient level of performance — by his counsel, not by the prosecution or the trial judge. Furthermore, when the prosecution and the trial judge are operating under a mistaken view of the law, the performance of defense counsel becomes *more* important, because he is then the only one left to correct the misunderstanding. Accordingly, we conclude that the state court unreasonably applied *Strickland* in concluding that the performance of Joseph's trial counsel was constitutionally adequate.

The prejudice inquiry is similarly straightforward. If Joseph's trial counsel had objected to the flawed indictment and erroneous jury instruction, then the players at trial would not have labored under an incorrect understanding of the capital specification, and there is a reasonable probability that the outcome would have been different (i.e., that Joseph would not have received a death sentence), in at least three identifiable ways. First, there is a reasonable probability that the prosecution, which conceded that it could not prove that Joseph actually killed the victim, would have declined to charge Joseph with the specification. Second, there is a reasonable probability that, given the prosecution's concession that it could not prove that Joseph actually killed the victim, a properly instructed jury would have found Joseph not guilty of the specification. Third, even if the jury still found Joseph guilty of the specification, there is a reasonable probability that a trial judge with a proper understanding of the specification would have intervened, either by setting aside the verdict after the guilt phase or by rejecting the jury's recommendation of a death sentence after the penalty phase. Thus, we have little trouble concluding that Joseph's defense was prejudiced by his trial counsel's deficient performance, and that the state court unreasonably applied *Strickland* in concluding otherwise.

Having determined that habeas relief is warranted on Joseph's independent IAC claim, it necessarily follows that Joseph has established cause to excuse the procedural default of his indictment and jury-instruction claims. Of course, Joseph must also establish the prejudice component of cause and prejudice. The Supreme Court has declined to provide a general definition of "prejudice" for purposes of cause and prejudice. *United States v. Frady*, 456 U.S. 152, 168 (1982). Nevertheless, the Court has given some instructive content to the term by explaining that one way to establish the prejudice component of cause and prejudice is to establish *Brady* materiality. *Banks v. Dretke*, 540 U.S. 668, 691, 698 (2004); *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Given that *Strickland* prejudice is governed by a standard worded similarly to the *Brady* materiality standard, *compare Kyles v. Whitley*, 514 U.S. 419, 433 (1995) ("[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (internal quotation marks omitted)), *with Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."),[16] it follows that establishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice. *Mincey v. Head*, 206 F.3d 1106, 1147 n.86 (11th Cir. 2000), *cert. denied*, 532 U.S. 926 (2001); *Prou v. United States*, 199 F.3d 37, 49 (1st Cir. 1999). Thus, Joseph has established cause and prejudice to excuse his procedural default.

We may now turn to the merits of Joseph's indictment and jury-instruction claims. As we noted above, the state declined to argue the merits of these claims. Therefore, it is not clear that the state is even appealing the district court's resolution of the merits in Joseph's favor. Accordingly, we discuss the merits (which we affirm) only briefly.

### 2. Flawed Indictment

"No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *see also Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005) ("[A]n indictment is only [constitutionally] sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy.").[17] "These fundamental principles of procedural fairness apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt-determining phase of any criminal trial." *Presnell v. Georgia*, 439 U.S. 14, 16 (1978). Joseph claims that he was denied due process because the flawed indictment failed to give him adequate notice of the capital specification. The Ohio Supreme Court acknowledged the error in the indictment, but it concluded that Joseph had received sufficient notice of the correct capital specification and that the error had not prejudiced his defense. *Joseph II*, 653 N.E.2d at 291-92.

Joseph principally relies on *Lucas v. O'Dea*, 179 F.3d 412 (6th Cir. 1999). There, a person was shot and killed in the course of a robbery committed by Lucas and two other men. Lucas was indicted for intentional murder, which required proof that he shot the victim. The only witness testified that he did not know which of the robbers fired the fatal shot, and Lucas's entire defense was that he did not shoot the victim. Despite the intentional-murder charge in the indictment, the jury was given instructions for wanton murder, for which it was immaterial who fired the shot. The state supreme court upheld the conviction, characterizing it as a conviction for wanton murder. We concluded that in these circumstances, Lucas had been "deprived . . . of his Fourteenth Amendment right to notice of the charges against him." *Id.* at 417. We conclude likewise here: much as Lucas was indicted for one crime (intentional murder) but convicted of another (wanton murder), Joseph, too, was indicted for one asserted capital specification (being the principal offender in commission of the kidnapping) but convicted of another (being the principal offender in the commission of the aggravated murder). Indeed, the lack of notice is arguably even worse here, as Joseph was initially indicted under a specification that did not even exist.

---

[16] This similar wording is, of course, no coincidence. The Court explicitly acknowledged in *Strickland* that its "test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." 466 U.S. at 694 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112-13 (1976)). A majority of the Court then imported "the *Strickland* formulation of the *Agurs* test for materiality" back into *Brady* doctrine. *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J., joined by O'Connor, J.); *see also id.* at 685 (White, J., joined by Burger, C.J., and Rehnquist, J., concurring in part and concurring in the judgment) (agreeing with the standard).

[17] It seems clear that Joseph's indictment fails the requirement of containing the elements of the charged offense, as the capital specification omitted the element of being the principal offender in the commission of the aggravated murder. Nevertheless, Joseph has not made this claim, so we do not reach it.

In granting relief on this claim, the district court, relying on *United States v. Ford*, 872 F.2d 1231, 1235-36 (6th Cir. 1989) (explaining that an amendment to an indictment is prejudicial per se), *cert. denied*, 498 U.S. 843 (1990), held that the error in Joseph's indictment was not subject to harmless-error review. The district court held in the alternative that the error was not harmless in this case. Given the Supreme Court's decision in *Esparza II* (discussed above), we think it prudent to engage in the harmless-error analysis.[18] For the reasons similar to those that have already been discussed above, we conclude that the due-process violation "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted), and therefore was not harmless. Moreover, it was objectively unreasonable for the state court to conclude otherwise.

### 3. Erroneous Jury Instructions

Supreme Court precedent clearly establishes that "[i]n a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979)). "The only question . . . is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citations omitted) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Joseph's jury-instruction claim is based, of course, on the erroneous principal-offender instruction.

The Ohio Supreme Court's rejection of Joseph's claim was premised on the idea that because the trial court read the correct specification once, it cured any error in the instructions. *Joseph II*, 653 N.E.2d at 294-95. We conclude that this decision is both contrary to and an unreasonable application of clearly established federal law. The decision is contrary to Supreme Court precedent in that it ignored the approach that the Court has explicitly articulated for this type of claim. *See Williams*, 529 U.S. at 405 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."). By excusing the error solely on the basis of the single instance in which the trial court read the correct specification, the state court "judged in artificial isolation" that one correct reading, virtually ignoring "the context of the instructions as a whole and the trial record," i.e., the countless times that the incorrect specification was stated or referenced. *McGuire*, 502 U.S. at 72 (internal quotation marks omitted).

The state court also unreasonably applied clearly established federal law. The jury instructions repeatedly and incorrectly stated (either explicitly or by reference to earlier misstatements) that the capital specification required proof that Joseph was the principal offender in the commission of the kidnapping. Thus, the instructions omitted the element of being the principal offender in the commission of the aggravated murder, i.e., that Joseph "actually killed" the victim, which means that they "fail[ed] to give effect to th[e] [due-process] requirement" that "the State must prove every element of the offense." *McNeil*, 541 U.S. at 437. The rest of "the trial record," *McGuire*, 502 U.S. at 72, compounded the error in the jury instructions, as both the prosecution and Joseph's counsel repeatedly misstated the specification in their opening statements and closing and rebuttal arguments. The single instance in which the trial court correctly read the

---

[18] We note that the Supreme Court recently granted certiorari with respect to "[w]hether the omission of an element of a criminal offense from a federal indictment can constitute harmless error." *United States v. Resendiz-Ponce*, — U.S. —, 126 S. Ct. 1776 (2006). The outcome of *Resendiz-Ponce* might affect whether defective *state* indictments like the one here are subject to harmless-error analysis, although even that is not certain because federal and state indictments are not necessarily subject to the same requirements. *See Apprendi v. New Jersey*, 530 U.S. 466, 477 n.3 (2000) (noting that the Fifth Amendment's Indictment Clause has not been incorporated against the states).

specification to the jury was insufficient to cure the pervasive errors elsewhere in the instructions and the rest of the proceedings. *See Francis v. Franklin*, 471 U.S. 307, 322 (1985) ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict."); *Laird v. Horn*, 414 F.3d 419, 427-28 (3d Cir. 2005) ("[W]e can not conclude that such a brief reference to the required *mens rea* for first-degree murder remedies the incorrect and misleading portion of the instruction."), *cert. denied*, — U.S. —, 126 S. Ct. 1143 (2006); *Everett v. Beard*, 290 F.3d 500, 512 (3d Cir. 2002) ("The mere fact that the law was correctly stated in one part of the charge will not automatically insulate the charge from a determination of error."), *cert. denied*, 537 U.S. 1107 (2003). Once again, for reasons that have been discussed at length, the due-process violation was not harmless. *See Brecht*, 507 U.S. at 623.

## IV. CLAIMS ATTACKING THE AGGRAVATED-MURDER CONVICTION

The district court denied each of Joseph's claims attacking the underlying aggravated-murder conviction. Joseph pursues four of these claims on appeal, arguing that (1) the trial court admitted statements obtained by the police in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); (2) the refusal to grant a change of venue on the grounds of pretrial publicity resulted in the denial of Joseph's Sixth Amendment right to an impartial jury; (3) the prosecution suppressed material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (4) the prosecution made numerous improper statements amounting to misconduct in violation of the Due Process Clause. For the reasons below, we affirm the district court's denial of these claims.

### A. *Miranda*

Before the state courts, Joseph challenged the admission of four statements on *Miranda* grounds. The Ohio Court of Appeals, which was the last state court to issue a reasoned opinion on this claim, gave the following account of the circumstances surrounding these statements:

> At approximately 5:00 a.m. on June 27, 1990, the morning Ryan was discovered missing, three deputy sheriffs went to [Joseph's] residence. [Joseph] and Bulerin came to the door, where [Joseph] was questioned. [Joseph] disclaimed any knowledge of the disappearance. [Joseph] was then transported to the sheriff's office by one of the deputies. At the sheriff's office [Joseph] waited for the arrival of Detective Cheney. He was read his *Miranda* rights and signed a waiver of rights form prior to any questioning. This interview lasted approximately twenty minutes, after which time [Joseph] left. *Later that morning he was again taken to the sheriff's office by a deputy who picked him up from work. [Joseph] voluntarily agreed to go with the deputy to the sheriff's office where he was questioned a third time at approximately 10:15 a.m. [Joseph] was not under arrest and no* Miranda *warnings were given. Detective Ketchum, the deputy who interviewed [Joseph] this time, testified [Joseph's] statements were voluntary and he was free to leave at any time.* A fourth interview with [Joseph] was conducted after his arrest on the evening of July 4, 1990. He was informed of his rights which he chose to waive, and consented to the interview.

*Joseph I*, 1993 WL 531858, at *31 (emphasis added). Before this court, Joseph challenges only the third statement, the facts of which are emphasized in the quoted passage.

*Miranda* "held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence." *Dickerson v. United States*, 530 U.S. 428, 431-32 (2000). There is no doubt that Joseph was interrogated by Detective Ketchum for purposes of *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) ("[T]he *Miranda* safeguards

come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (footnote omitted)). And it is undisputed that Joseph was not given *Miranda* warnings before being interrogated. The critical question in the instant case, then, is whether Joseph was in custody, which under clearly established Supreme Court precedent depends on "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) ("[W]ould a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]"). The state court answered this question in the negative.

Joseph first argues that the state court's decision was contrary to *Berkemer v. McCarty*, 468 U.S. 420 (1984), and *Stansbury v. California*, 511 U.S. 318 (1994). Under these cases, along with *Beckwith v. United States*, 425 U.S. 341 (1976), "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323 (explaining that *Beckwith* and *Berkemer* make this proposition clear).[19] According to Joseph, the state court's decision was contrary to these precedents because the court applied a subjective test for custody (based on Detective Ketchum's views) rather than the objective test mandated by the Supreme Court. *See Williams*, 529 U.S. at 405 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."). Yet the state court explicitly relied on *Berkemer* and stated the governing standard in objective terms: "the Supreme Court held the relevant inquiry regarding a custodial interrogation to be how *a reasonable person in the suspect's position would have understood his situation*." *Joseph I*, 1993 WL 531858, at *31 (emphasis added). Furthermore, the court principally discussed objective facts in applying the custody standard to the facts. *See id.* at *31-*32. Finally, to the extent that some of the facts mentioned by the court arguably indicate the subjective views of the officers, it appears that they were either simply given as background or can also be read as indicating the subjective impressions of the officers *that were made known to Joseph*. Thus, we conclude that the state court's decision was not contrary to clearly established federal law.

Joseph next argues that the state court unreasonably applied clearly established federal law. In *Yarborough v. Alvarado*, 541 U.S. 652 (2004), the Supreme Court recently reviewed a state court's application of the *Miranda* custody test under AEDPA's unreasonable-application prong, so we naturally begin our analysis there. The Court explained that whether a state court's application of clearly established federal law is "unreasonable" is a context-sensitive inquiry:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

---

[19] It is unproblematic that Joseph relies on *Stansbury* — a case that postdates the decision of the Ohio Court of Appeals — because *Stansbury* simply applied the clearly established precedents of *Beckwith* and *Berkemer*, both of which predated the Ohio court's decision. *See Stansbury*, 511 U.S. at 323 ("Our decisions make clear . . . .").

*Id.* at 664. Within this framework, the Court gave the state court considerable "leeway" because *Miranda*'s "custody test is general." *Id.* at 665. The Court noted that "certain facts weigh[ed] against a finding that [the defendant] was in custody" while "[o]ther facts point[ed] in the opposite direction." *Id.* at 664-65. Given "[t]hese differing indications," the Court concluded that "the state court's application of [clearly established federal] law fit[] within the matrix of [the Court's] prior decisions" and therefore was reasonable. *Id.* at 665.

Here, too, there are "differing indications" of whether Joseph was in custody. On the one hand, Joseph was transported from his workplace to the sheriff's office by a deputy; Joseph had already been questioned by the police twice earlier that day; and Detective Ketchum never told Joseph that he was free to leave. On the other hand, Joseph went *voluntarily* with the deputy to the sheriff's office; Detective Ketchum never told Joseph that he was *not* free to leave; and the interview with Detective Ketchum was brief, lasting only twenty-five minutes. Were we reviewing Joseph's *Miranda* claim de novo, this might very well be a close case. That is not, however, the posture of this appeal. What the Supreme Court said in *Yarborough* is applicable here:

> We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable. Under that standard, relief cannot be granted.

541 U.S. at 665-66 (alterations in original) (citations omitted) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)).

## B. Pretrial Publicity

Joseph argues that he was denied his Sixth Amendment right to be tried by an impartial jury because the jury in his case was infected by pretrial publicity surrounding the murder. We have explained that "there is clearly established Supreme Court precedent distinguishing between cases involving presumed prejudice — when the 'setting of the trial [is] inherently prejudicial,' — and actual prejudice — when review of both the jury voir dire testimony and the extent and nature of the media coverage indicates 'a fair trial [was] impossible.'" *Nevers v. Killinger*, 169 F.3d 352, 364 (6th Cir. 1999) (alterations in original) (citations omitted) (quoting *Murphy v. Florida*, 421 U.S. 794, 798, 803 (1975)), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). The Ohio Court of Appeals, which was the last state court to issue a reasoned opinion on this issue, rejected both types of claims, principally on the basis of the jurors' responses during voir dire and the trial court's instructions to the jury. *See Joseph I*, 1993 WL 531858, at *6-*7.

Joseph makes a very narrow argument to this court, basically contending that "the trial court failed to perform a searching *voir dire*" and did not "determin[e] the specific influences on the jurors." Petitioner-Appellant First Br. at 83, 96; *see also id.* at 85 n.32, 94-95. In *Mu'Min v. Virginia*, 500 U.S. 415 (1991), the Supreme Court rejected the similar argument that a trial court must ask questions regarding the content of the news reports (i.e., what Joseph calls "the specific influences") to which potential jurors may have been exposed. *Id.* at 424-25. The Court explained that "8 of the 12 jurors who sat answered that they had read or heard something about the case, but none of those 8 indicated that he had formed an opinion as to guilt, or that the information would affect his ability to judge petitioner solely on the basis of the evidence presented at trial." *Id.* at 428. In the instant case, all twelve jurors had heard about the case, but each stated that he or she had formed no opinion on the case, could disregard the media accounts, and could decide the case based solely on the evidence presented at trial. Given that *Mu'Min* forecloses Joseph's argument, we

cannot conclude that the state court's decision was contrary to or an unreasonable application of clearly established federal law.

## C. *Brady*

### 1. Standard of Review

The Ohio Supreme Court rejected Joseph's *Brady* claim, which was principally based on the delayed disclosure of a grant of immunity that had been given to William Forest, a key witness for the prosecution. *Joseph II*, 653 N.E.2d at 292-93. If Joseph were now bringing the same *Brady* claim, i.e., one premised on the same suppressed evidence, then it would be a "claim that was adjudicated on the merits in State court proceedings," and we would review the state court's decision only for whether it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). However, Joseph's current *Brady* claim is not the same as the one he brought before the state courts: he now relies on a different mix of suppressed evidence that includes some items discovered only during federal habeas proceedings. Thus, Joseph argues, his *Brady* claim was *not* "adjudicated on the merits in State court proceedings," and AEDPA's strict standard of review does not apply. We agree. In *Williams v. Coyle*, 260 F.3d 684 (6th Cir. 2001), *cert. denied*, 536 U.S. 947 (2002), we reviewed a *Brady* claim based on evidence disclosed during federal habeas proceedings "under pre-AEDPA standards because no state court reviewed the merits of that claim." *Id.* at 706; *see also Monroe v. Angelone*, 323 F.3d 286, 297-98 (4th Cir. 2003) (collecting cases); *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (noting that "[w]here new evidence is admitted, some Courts of Appeals have conducted *de novo* review on the theory that there is no relevant state-court determination to which one could defer" and "[a]ssuming . . . that this analysis is correct and that it applies where . . . the evidence does not support a new claim but merely buttresses a previously rejected one"). Because AEDPA's standard of review does not apply here, we review the district court's factual findings for clear error, while whether a *Brady* violation occurred is a mixed question of law and fact that we review de novo. *Williams*, 260 F.3d at 706.

### 2. Merits

The Supreme Court recently provided the following concise summary of *Brady* doctrine:

> In *Brady*, this Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S., at 87. We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985). Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 682; see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). Moreover, the rule encompasses evidence "known only to police investigators and not to the prosecutor." *Id.*, at 438. In order to comply with *Brady*, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Kyles*, 514 U.S., at 437.

*Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). The Court also distilled the "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because

it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281-82.

### a. Favorable to the Accused

We first address whether the evidence on which Joseph relies was favorable to him:[20]

1. Forest's immunity agreement. This item, which was disclosed belatedly at trial, was obviously favorable to Joseph, as it could have been used to impeach Forest. As Seventh Circuit has explained:

> The prosecution's giving a witness benefits — leniency, cash, or anything else — can be used by a cross-examining defense counsel to undermine the witness in two . . . distinct ways. The first and most common is by showing that the benefits were given in return for the witness's providing testimony that would help the prosecution. He might have told the prosecutor what he would testify to if called and the prosecutor might have explicitly agreed to give him specified benefits if he testified consistently with his proffer. Or there might have been a tacit understanding that if his testimony was helpful to the prosecution, the state would give him a break on some pending criminal charge. . . . Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense.

*Wisehart v. Davis*, 408 F.3d 321, 323-24 (7th Cir. 2005) (citations omitted), *cert. denied*, — U.S. —, 126 S. Ct. 1617 (2006).

2. Transcript of Ketchum's post-arrest interview of Forest on July 4, 1990. In this interview, which was disclosed belatedly at trial, Forest stated that on the morning after the murder, Bulerin bought tires for a client's car. At trial, Forest testified that on the morning after the murder, Bulerin bought and changed the tires on Forest's car. Although these two statements are not directly contradictory, they are somewhat inconsistent. Accordingly, the evidence could have been used to impeach Forest and is favorable to Joseph.

3. Transcript of Dailey and Van Horn's interview of Forest on July 7, 1990. In this interview, which was disclosed belatedly at trial, Forest was asked, "When is the last time you're sure that knife was in your car?" In response, Forest said:

> Um . . . I've really never use - it usually rattles on my car, as I'm driving down the road. I haven't driven my car too much lately - but I know I've not seen it since . . . at least maybe - before . . . they claimed it was lost. I've just never really paid attention to it - plus I never have my car to drive it.

21 J.A. at 8340 (omissions in original). (The phrase "before . . . they claimed it was lost" refers to Bulerin telling Forest on Thursday, June 28, 1990 or Friday, June 29, 1990 that the knife was lost. 21 J.A. at 8339-40.) The import of this statement is that Forest could not precisely pinpoint when he last saw the knife in his car. Yet at trial, Forest definitively testified that the knife was in the car

---

[20] Joseph also refers to various items that are not in the record and therefore presumably cannot be located. The district court acknowledged some of these materials, but it did not include them in its analysis, apparently because they "b[ore] no consequence on the Court's decision with respect to this claim." 2 J.A. at 794 n.53. This statement appears to reflect the belief that a due process claim cannot be based on evidence that has not been located, which is incorrect because such a claim is cognizable under the failure-to-preserve-evidence doctrine of *Arizona v. Youngblood*, 488 U.S. 51 (1989), and *California v. Trombetta*, 467 U.S. 479 (1984). However, Joseph did not invoke this doctrine in his habeas petition and does not now do so on appeal, so he has not properly raised this claim.

on June 26, 1990. Thus, the evidence could have been used to impeach Forest and is favorable to Joseph.

4. Notes of Cheney's interview of Forest on June 28, 1990. On its face, the single page of interview notes, which was discovered during the federal habeas proceedings below, does not appear to contain any favorable information. Nor does Joseph explain how these notes are favorable to him.

5. Transcript of Van Horn's interview of Thad Randall Staley on June 27, 1990. In this interview, which was discovered during the federal habeas proceedings below, Staley (who knows Forest) stated that he saw a car that looked like Forest's being driven on Thayer Road — Wireman's residence was on Thayer Road — at about 1:50 AM on the night/morning of the murder. According to Staley, there were two or more people in the car, and the driver "kind of looked like" Forest. 21 J.A. at 8365. Although this evidence does not exculpate Joseph (he might have been one of the other people in the car), it suggests that Forest was involved in the murder by placing him in the car seen at the scene of the murder at approximately the right time. Thus, it could have been used to impeach Forest and is favorable to Joseph.

6. Notes of a statement made by Tony Newland on June 30, 1990. In this statement, which was discovered during the federal habeas proceedings below, Newland asserted that he saw Forest at a car wash "cleaning a car that matched the description . . . 'too' thoroughly." 21 J.A. at 8361. Whether this evidence is favorable to Joseph is a close question. On one hand, it does not exculpate Joseph and it is quite vague. On the other hand, it suggests that Forest was "covering up" evidence and therefore was involved in the murder. On balance, it probably could have been used to impeach Forest.

### b. Materiality/Prejudice

There is no dispute as to the fact that these items were suppressed, so we proceed directly to the issue of materiality/prejudice. We conduct this inquiry mindful of the Supreme Court's admonition that "suppressed evidence [must be] considered collectively, not item by item," when determining materiality/prejudice.[21] *Kyles*, 514 U.S. at 436; *accord, e.g.*, *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003). All five items of suppressed evidence that were favorable to Joseph were favorable in the sense that they would have impeached Forest. And viewed collectively, these items would have *strongly* impeached Forest, who was clearly a crucial trial witness for the prosecution.[22] We have little trouble assuming that, if all five items had been completely undisclosed, they certainly would have been material/prejudicial under *Brady*.

---

[21] The district court instead took a bifurcated approach: it first determined with respect to the delayed disclosures that Joseph was not prejudiced by the delay before then concluding that the completely undisclosed evidence was not material/prejudicial. This approach arguably finds some support in our statements to the effect that *Brady* does not apply to delayed disclosures unless the delay itself causes prejudice. *E.g.*, *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994), *cert. denied*, 513 U.S. 1117 (1995). Yet these cases are not quite on point, as they involved only delayed disclosures rather than a mix of belatedly disclosed and completely undisclosed evidence. We think the better approach is to apply the Supreme Court's command that "suppressed evidence [must be] considered collectively, not item by item," when determining materiality/prejudice, *Kyles*, 514 U.S. at 436, no matter whether the collection of evidence includes only completely undisclosed items, only belatedly disclosed items, or a mixture of the two. This is especially so given that the question of whether a delay causes prejudice is really just a type of inquiry into materiality. *See Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir.), *cert. denied*, 525 U.S. 935 (1998).

[22] Forest testified that Joseph and Bulerin had access to Visqueen (the material in which Young's body was found) at the sand and gravel lot, that Joseph's and Bulerin's demeanors were unusual the morning after the kidnapping, that Bulerin changed the tires on Forest's car the morning after the murder, that a knife was kept in Forest's car and was in the car on the day of the murder, that Joseph and Bulerin kept a shovel in Forest's car, and that Joseph owned a black ninja mask like the one discovered near Young's body.

As we have already indicated, however, the three most strongly impeaching items — the immunity agreement, the statement about Bulerin changing the tires, and the statement about the knife — were belatedly disclosed during trial rather than completely undisclosed. Thus, we must consider as part of the collective materiality inquiry the extent to which the delay prejudiced Joseph. *E.g.*, *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994), *cert. denied*, 513 U.S. 1117 (1995). Here, the trial court implemented several measures to remedy the delay. The court gave the defense several days to review the belatedly disclosed documents and to conduct a deposition of Forest. The court also gave the defense the opportunity to re-call Forest at trial. The defense declined to do so, but there is no suggestion that this decision was the result of insufficient time to prepare; if the defense needed more time, it could have asked for a continuance. *See, e.g.*, *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir.) ("[C]ounsel for [the defendant] made no request for . . . a continuance. In such a circumstance, we conclude that the timing of the disclosure did not prejudice [the defendant]."), *cert. denied*, 469 U.S. 1021 (1984); *United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991) ("Generally, we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously."). In fact, it appears that the defense declined to re-call Forest for strategic reasons, 10 J.A. at 3795 (Trial Tr. at 1871), so that choice cannot now be used to attempt to magnify the prejudice of the delay. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (holding that there was no prejudice from a delayed disclosure where the "[d]efendant was given every opportunity to review the [newly disclosed] tapes and to recall [the witness] if necessary, but he refused to do so"), *cert. denied*, 537 U.S. 1208 (2003). Furthermore, the defense emphasized in its closing argument that "Forest was given immunity and released from jail for his testimony" and that his testimony therefore should be viewed "very cautiously." 11 J.A. at 3956 (Trial Tr. at 2025). Finally, the trial court instructed the jury at the close of trial: "If you find that immunity has been granted to any witness, the credibility of such testimony must be examined with greater scrutiny than testimony of an ordinary witness." 11 J.A. at 3988-89 (Trial Tr. at 2057-58). These remedial measures reduced the potential materiality/prejudice of the delay in disclosing these three pieces of evidence.[23]

Finally, we add the two completely undisclosed items to the mix. These items were only weakly impeaching, and they would have added little to the impeachment of Forest if Joseph had taken advantage of the ample opportunity to use the belatedly disclosed evidence. Given that Joseph could have (but declined) to make use of the items that would have strongly impeached Forest after they were belatedly disclosed and that the completely undisclosed items would have only weakly impeached Forest, we cannot conclude that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34.

## D. Prosecutorial Misconduct

Joseph's final claim is that the prosecution violated his right to due process by committing misconduct. The Ohio Court of Appeals, which was the last state court to issue a reasoned opinion on the issue, rejected Joseph's various sub-claims because the prosecution's conduct was either not

---

[23] Joseph argues that if not for the delay, he would have prepared differently for voir dire, opening statements, and cross-examination of other witnesses. In other words, he claims that he was prevented from preparing a coordinated defense centered around attacking Forest's credibility. Some circuits have phrased the delayed-disclosure tests in terms of the defendant's ability to prepare for trial. *See United States v. Ingraldi*, 793 F.2d 408, 411-12 (1st Cir. 1986); *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir.), *cert. denied*, 429 U.S. 924 (1976); *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir.), *cert. denied*, 426 U.S. 924 (1976). This court has not, however, endorsed such a formulation. Rather, we have expressly recognized the Supreme Court's explicit rejection of the argument that "the [materiality] standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial," *United States v. Agurs*, 427 U.S. 97, 112 n. 20 (1976). *See Norris*, 146 F.3d at 334; *Bencs*, 28 F.3d at 560.

improper or did not prejudice Joseph. *Joseph I*, 1993 WL 531858, at \*16-\*18. We review Joseph's claim using the following approach:

> On habeas review, claims of prosecutorial misconduct are reviewed deferentially. To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Even if the prosecutor's conduct was improper or even "universally condemned," we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair. Once we find that a statement is improper, four factors are considered in determining whether the impropriety is flagrant: (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial.

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003) (citations omitted) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)), *cert. denied*, 543 U.S. 842 (2004). We discuss the propriety of each complained-of statement before considering the effect of improper ones (if any) collectively.

Joseph first argues that the prosecution commented on Joseph's failure to take the stand when it said, "[Joseph's counsel] would have you infer that there was no kidnapping. Well, you, ladies and gentlemen of the jury, heard all of the evidence. You heard each and every thing that would go to show kidnapping. Uncontroverted. Uncontroverted from that witness stand." 11 J.A. at 3971 (Trial Tr. at 2040). "The law is clear that the prosecution cannot comment on a defendant's decision not to testify at trial." *Bowling*, 344 F.3d at 514 (citing *Griffin v. California*, 380 U.S. 609, 615 (1965)). However, "'[g]eneral references to evidence as uncontradicted, while not recommended, may not reflect on the defendant's failure to testify where witnesses other than the defendant could have contradicted the evidence.'" *Byrd v. Collins*, 209 F.3d 486, 534 (6th Cir. 2000) (quoting *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983)), *cert. denied*, 531 U.S. 1082 (2001). Moreover, the comment was neither flagrant nor repeated. Finally, the trial court instructed the jury about Joseph's right not to testify.

Joseph next contends that the prosecution shifted the burden of proof to him when it asked, "What evidence do we have, ladies and gentlemen, that this defendant didn't do it?" 11 J.A. at 3977 (Trial Tr. at 2046). "[I]t [is] improper for the prosecutor to suggest that the defendant ha[s] the burden of proof or any obligation to produce evidence to prove his innocence." *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993). However, the trial court immediately sustained an objection to the question and instructed the jury to disregard it. The court also instructed the jury about the state's burden of proof.

Joseph also claims that the prosecution improperly expressed personal opinions. Specifically, the prosecution vouched for Forest's credibility and otherwise repeatedly prefaced statements with "I believe" or "I think." These comments certainly were improper, *see United States v. Young*, 470 U.S. 1, 18-19 (1985); *Bates v. Bell*, 402 F.3d 635, 644 (6th Cir.), *cert. denied*, — U.S. —, 126 S. Ct. 163 (2005), but they did not rise to the level of a due-process violation. With respect to the vouching for Forest, the prosecution was arguably simply noting the consistency between his testimony and other evidence, and in any event the vouching was isolated. With respect to the repeated use of "I believe" and "I think," it does not appear that the prosecution was acting intentionally in an attempt to influence the jury; instead, the phrases appeared to be the result of a nervous habit. Furthermore, the trial judge repeatedly chastised the prosecution for its locution and instructed the jury to disregard expressions of personal belief.

Joseph next asserts that the prosecution elicited testimony from two witnesses that was inconsistent with prior statements they had made prior to trial: Forest testified definitively at trial that the knife was in the car on June 26, 1990, even though he had previously given a statement that he could not precisely pinpoint when he last saw the knife in his car; and the coroner testified at trial that she could not definitively say whether the cuts on Young's neck were inflicted pre- or postmortem, even though she had previously given a statement that the cuts were probably inflicted postmortem. "Misrepresenting facts in evidence can amount to substantial error because doing so 'may profoundly impress a jury and may have a significant impact on the jury's deliberations.'" *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)). "For similar reasons, asserting facts that were never admitted into evidence may mislead a jury in a prejudicial way." *Id.* (citing *Berger v. United States*, 295 U.S. 78, 84 (1935)). The difficulty with Joseph's argument is that neither of these claims apply. The prosecution did not "assert[] facts that were never admitted into evidence": it elicited trial testimony from witnesses, so the facts in their testimony *were admitted into evidence*. Nor did the prosecution "[m]isrepresent[] facts in evidence": after eliciting trial testimony from witnesses, it simply relied on those facts in its arguments. Joseph's real quarrel is that the prosecution possessed but did not disclose prior statements that were inconsistent with the testimony elicited at trial. But that claim sounds in a different type of prosecutorial misconduct: *Brady* doctrine.[24]

Finally, Joseph complains that when mitigation witnesses testified about Joseph's childhood and learning disability, on a few occasions the prosecution cross-examined them by asking what those topics had to do with the kidnapping. Joseph argues that in doing so, the prosecution improperly suggested that the jury could not consider certain mitigating evidence. Although it is unconstitutional for "a prosecutor's comments . . . to 'constrain the manner in which the jury was able to give effect' to mitigating evidence, *DePew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002) (quoting *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998)), *cert. denied*, 540 U.S. 888 (2003), the prosecution's questions here did not rise to that level. In any event, the trial court gave the jury a proper instruction on the consideration of mitigating evidence.

It is clear that the prosecution made some improper statements and other questionable ones. Viewed collectively, they very well may have violated due process as a de novo matter. However, because some comments were isolated, inadvertent, or not flagrant, and because the trial court consistently gave curative instructions, we conclude that the state court's rejection of Joseph's prosecutorial misconduct claim was neither contrary to nor an unreasonable application of clearly established federal law.

## V. CONCLUSION

For the reasons set forth above, we **AFFIRM** the grant of a writ of habeas corpus.

---

[24] Joseph relied on Forest's but not the coroner's prior statement in support of his *Brady* claim, which we rejected for the reasons above. We express no opinion as to whether Joseph's *Brady* claim would have succeeded had he also relied on the coroner's statement.