*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT RILEY,

*Petitioner-Appellee,*

No. 05-2559

*v.*

MARY BERGHUIS,

*Respondent-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-71573—Arthur J. Tarnow, District Judge.

Argued: January 31, 2007

Decided and Filed: April 3, 2007

Before: NORRIS, COLE, and CLAY, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Louis K. Fisher, JONES DAY, Washington, D.C., for Appellee. **ON BRIEF:** Brad H. Beaver, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Louis K. Fisher, JONES DAY, Washington, D.C., for Appellee.

---

**OPINION**

---

R. GUY COLE, JR., Circuit Judge. In 1998, Petitioner-Appellee Robert Riley was convicted in Michigan state court of aiding and abetting the felony murder of Mark Seaton, and sentenced to life in prison without parole. On direct appeal, Riley argued that he was deprived of the effective assistance of counsel because his trial attorney failed to move for a directed verdict of acquittal at the close of the State's case-in-chief. The Michigan Supreme Court rejected Riley's claim, holding that Riley's counsel was not deficient within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to move for a directed verdict, because the evidence adduced by the State was sufficient to support Riley's conviction.

Thereafter, Riley filed a petition for a writ of habeas corpus in the district court. The district court granted the petition, concluding that the Michigan Supreme Court unreasonably applied the *Strickland* test to the facts of Riley's case. For the reasons set forth below, we **REVERSE** the judgment of the district court.

1

# I. BACKGROUND

## A. Facts

### 1. *The Prosecution's Case-In-Chief*

At Riley's trial, the prosecution presented circumstantial evidence implicating Riley in Seaton's murder. The key evidence included (1) Riley's statement to the police following his apprehension, and (2) testimony from (i) witnesses who saw Riley at Seaton's apartment around the time that Seaton was killed, (ii) a local security guard who saw Riley running down an alley near Seaton's apartment building, (iii) police officers called to the scene of Seaton's murder, and (iv) the medical examiner who determined the cause of Seaton's death.

### *(a) Riley's Statement to the Police*

After he was taken into custody, Riley voluntarily told the police about the events surrounding Seaton's death and answered questions. Detroit police officer Samuel Quick interviewed Riley and read Riley's statements into the record at trial.

Riley told Quick that he and Seaton were friends. Riley called Seaton on the morning of June 27, 1997—the day Seaton was murdered—to tell Seaton that he planned on stopping by Seaton's apartment after taking care of some personal business. On his way to Seaton's, Riley encountered David Ware, whom Riley had known for about month. Ware asked Riley where he was going. When Riley responded that he was headed to Seaton's, Ware decided to accompany him.

At Seaton's apartment, Riley claims that Seaton and Ware engaged in sexual activity. The three men left at some point to buy alcohol, but returned immediately thereafter. Riley told the police that Ware asked to take a shower, which Seaton permitted, and then Seaton took his own shower, and came out of the bathroom nude. When Seaton was done showering, Riley went to use the bathroom. While he was in the bathroom, Riley heard a loud noise, "like someone had hit the floor." Joint Appendix ("J.A.") at 158. Riley came out of the bathroom to discover that Ware had Seaton in a "sleeper hold" on the floor and was choking him. Riley asked Ware "why was he doing that." *Id.* at 160. According to Riley, Ware told him to shut up and asked where the duct tape was. Riley told the police that, "I told [Ware] I didn't know what he was talking about." *Id.* When Seaton lost consciousness, Ware taped Seaton's arms and feet with duct tape and tied Seaton's hands together with a telephone cord. After being bound, Seaton started to revive but Ware strangled him again, this time resulting in Seaton's death.

Riley further told the police that after Seaton had been subdued, a woman knocked on Seaton's door asking to speak with him. Riley told the woman that Seaton was in the apartment but was not dressed.

Riley also explained that after Ware strangled and tied up Seaton, Ware stacked some of Seaton's personal belongings by the apartment door. Ware took Seaton's turntable and VCR and Riley admitted to taking Seaton's stereo mixer. Riley said that Ware attempted to steal Seaton's car but was not able to get it to start. After that, Riley and Ware fled the scene by running down a nearby alley together, carrying the goods they had taken from Seaton's apartment.

When questioned by Officer Quick, Riley could not explain why he did not stop Ware from strangling Seaton, why he did not leave Seaton's apartment when he realized that Ware intended to harm Seaton, or why he took Seaton's stereo mixer from the apartment.

*(b) Witness Testimony*

At trial, several residents of Seaton's apartment building testified about their observations of the events surrounding Seaton's death. Randy Hollis, for example, testified that he saw Riley with Seaton earlier in the week in which Seaton was killed. William McElroy testified that on the day of Seaton's murder, he watched Riley and another man unsuccessfully attempt to start Seaton's car and then retreat down a nearby alley. Sam Butler testified that on the day of the murder, he saw Seaton with two men in his car and then saw all three go into Seaton's apartment. Butler could not identify either man as Riley, however. Butler further testified that he lived in the apartment next to Seaton's and that although he had his door open during the time that Riley and Ware were in Seaton's apartment, he did not hear any noises coming from Seaton's apartment.

Gloria Hollis, Randy's wife, also testified at the trial. She had gone to Seaton's apartment to get laundry tokens and she testified about what happened when she knocked on Seaton's door. Gloria's account differed from what Riley told the police in that Gloria testified that when she first knocked, "a young man came to the door and said my cousin is not here." J.A. at 107. The situation seemed suspicious to Gloria so she knocked a second time. Two men then answered the door and the one Gloria identified as Riley said, "didn't I tell you my cousin wasn't here," and slammed the door in her face. *Id.* at 109. Concerned that something was wrong, Gloria left to confer with Randy, and convinced him to enter Seaton's apartment through an open window. When Randy did so, he found Seaton bound and dead on the floor. Randy and other residents testified that Seaton was lying naked on the floor with his wrists and ankles tied with duct tape and telephone cord.

When the apartment residents discovered what had happened to Seaton, they called the police. While monitoring police radio transmissions, Michael Thomas, a security guard from nearby Palmer Park, heard about a home invasion at Seaton's apartment building. He testified that on his way there, he saw two men, one of whom he recognized as Riley, running down the alley in front of his car. Thomas explained that he was familiar with Riley because he saw him everyday hanging out at the park and had spoken to Riley before. Because he knew who Riley was, Thomas followed Ware "to get a good description of" him. *Id.* at 147. Thomas testified that he saw Ware, with a VCR and some other object, get into a stopped car.

Joe Tucker, the first police officer to arrive at the scene, testified that Seaton's living room looked ransacked. The telephone was off the hook. Duct tape and wire were strewn about the floor. Bottles of alcohol were also littered about, and there were cigarettes and an overturned ashtray on the floor. Similarly, Officer Quick testified that "it was obvious that things had been disturbed in the apartment." *Id.* at 100. He testified that living room and bedroom pillows were on the floor and Seaton's dresser drawers and file-cabinet drawers were open.

Gloria Hollis also testified that Seaton's apartment was not in its usual, orderly state and that it appeared to have been ransacked. She testified that Seaton's entertainment center had been pulled away from the wall and some appliances were stacked in such a way as to suggest that they were about to be carried off.

Officer Tucker testified that witnesses at the scene provided him with physical descriptions of the suspects. One perpetrator was described as five feet, eight inches tall and one-hundred forty pounds, and the other was described as five feet, five inches tall and one-hundred thirty-five pounds. In contrast, Officer Tucker testified that Seaton had a "[p]retty heavy buil[d]." *Id.* at 82.

Dr. Cheryl Loewe, an assistant medical examiner for Wayne County, testified about the post-mortem examination of Seaton's body that she performed. Dr. Loewe testified that Seaton was five feet, eight inches tall, weighed two-hundred twenty-seven pounds, and "was a rather large framed muscular individual." *Id.* at 143. She opined that Seaton died as a result of strangulation. His toxicology report showed no evidence of drug or alcohol use. Dr. Loewe further testified that

Seaton bore no external abrasions, contusions, or scratches indicative of a struggle with his assailants.

Riley was apprehended two days after Seaton's murder when Thomas, the Palmer Park security guard, saw him at a bus stop and alerted the police. Ware was never apprehended.

### 2. *Riley's Defense*

At the close of the prosecution's case-in-chief, Riley's trial counsel did not move for a directed verdict of acquittal. Instead, Riley's counsel called a single witness, Mary McKinney. McKinney is Ware's mother. Riley's counsel explained that she felt compelled to note for the record that she had advised Riley of the risks entailed in calling McKinney as a witness, but that Riley wanted to proceed anyway.

McKinney testified that the day after Seaton's death, Ware told her that Seaton had come out of the shower nude and had made a sexual pass at him. Seaton told his mother that he responded by trying to push Seaton away and then putting a sleeper hold on him when Seaton turned around. McKinney further testified that when Riley came out of the bathroom, Ware told him to get the duct tape from the table and help him subdue Seaton, which Riley did. Ware told his mother that Seaton "was a large guy." *Id*. at 176. In response to a question from the prosecutor about whether Ware needed Riley's help to incapacitate Seaton "because of Mr. Seaton's size," McKinney testified "[r]ight." *Id.* at 177.

On redirect, Riley's counsel questioned McKinney about the written statement she gave to the police concerning what Ware told her. McKinney agreed that although she had signed off on the statement and made corrections to it, the statement did not reflect that she had told the police anything about Riley having assisted Ware in taping Seaton's hands and feet. The parties then stipulated that McKinney's written statement to the police did not make any mention of the assistance Riley purportedly rendered in subduing Seaton.

### 3. *The Prosecution's Rebuttal Case*

In its rebuttal case, the prosecution called Seaton's wife to testify, from whom Seaton had been living apart at the time of his death. She testified that Seaton had served in the military for eleven years, including in the first Iraq war, and that he had participated in U.N. peacekeeping operations. She further testified that Seaton was physically fit and was "constantly keeping up his physical condition." *Id*. at 184-85. By way of comparison, she testified that "[t]here is not a man in this courtroom that was bigger than my husband. Maybe taller, but not bigger." *Id.* at 186.

The jury convicted Riley of aiding and abetting Seaton's murder, and he was sentenced to life in prison without parole.

## B. Procedural History

Riley appealed his conviction and sentence to the Michigan Court of Appeals. That court reversed Riley's felony-murder conviction on the grounds that the admission at trial of McKinney's testimony—that Riley helped Ware subdue Seaton—violated Riley's Confrontation Clause rights because McKinney's assertion at trial was not included in her written statement to the police. *People v. Riley*, No. 211368, 2000 WL 33415967, *3 (Mich. Ct. App. July 21, 2000). Without McKinney's testimony, the Michigan appellate court held, there was not sufficient evidence to convict Riley of the charged offense. *Id.* Thus, the court reversed Riley's conviction and remanded the case for entry of a judgment of conviction for larceny in a building, the only judgment the court deemed supported by the evidence. *Id.*

The Michigan Supreme Court reversed on the grounds that Riley knowingly waived his Confrontation Clause rights. *People v. Riley*, 636 N.W.2d 514, 517 (Mich. 2001). The court's ruling was based on the statement made by Riley's counsel that she had advised Riley that calling McKinney to testify might harm his case, but that Riley wanted to go forward despite the risk. *Id.*

On remand, the Michigan Court of Appeals again reversed Riley's conviction and remanded for entry of a judgment of conviction for larceny in a building. *People v. Riley*, No. 211368, 2002 WL 522822 (Mich. Ct. App. Apr. 5, 2002). The Court of Appeals reasoned that the failure of Riley's counsel to move for a directed verdict of acquittal at the close of the prosecution's case constituted ineffective assistance of counsel because the evidence adduced by the prosecution was insufficient to convict Riley of aiding and abetting felony murder. *Id.* at *3-4.

The Michigan Supreme Court again reversed. *People v. Riley*, 659 N.W.2d 611 (Mich. 2003). It held that Riley's trial counsel was not deficient within the meaning of *Strickland* because the prosecution had presented sufficient evidence from which the jury could have concluded that the elements of the charged offense were satisfied. *Id.* at 614. Thus, Riley's counsel was under no obligation to move for a directed verdict. The Michigan Supreme Court reasoned that Riley "performed acts that assisted the commission of the murder" insofar as his misdirection of Gloria Hollis when she knocked on Seaton's door "possibly precluded the provision of medical assistance to the victim while he was still alive, hampered detection of the murder, or facilitated [Riley's] and Ware's escape." *Id.* Moreover, the Michigan Supreme Court held that the jury could have inferred that Riley participated in the murder based on his participation in the larceny: "Eyewitness testimony indicates that defendant participated in the crime by engaging in the larceny." *Id.*

Riley then filed a petition for a writ of habeas corpus in the district court. The district court held that the Michigan Supreme Court's decision rested on an unreasonable application of *Strickland*. *Riley v. Berghuis*, 388 F. Supp. 2d 789, 795 (E.D. Mich. 2005). The district court determined that Riley's counsel was deficient in failing to move for a directed verdict of acquittal because the evidence at the close of the prosecution's case-in-chief was insufficient to convict Riley. The court reasoned, among other things, that there was no evidence that Riley performed any acts to assist Ware in incapacitating Seaton and no evidence that Riley and Ware conceived of a plan to commit larceny. *Id.* at 795. Furthermore, according to the district court, the deficient performance of Riley's counsel prejudiced his case because there was a reasonable probability that the outcome of Riley's trial would have been different had his lawyer moved for a directed verdict. *Id.* at 796-97. Accordingly, the district court granted Riley habeas relief.

## II. DISCUSSION

### A. Standard of Review

We review the district court's legal conclusions de novo and its factual findings for clear error. *Brown v. Palmer*, 441 F.3d 347, 350 (6th Cir. 2006). Because Riley filed his petition for habeas relief after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), his petition is governed by AEDPA's standards. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006). "Under AEDPA, a federal court may grant a writ of habeas corpus with respect to a 'claim that was adjudicated on the merits in State court proceedings' if the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* (quoting 28 U.S.C. § 2254(d)(1)). A state-court decision unreasonably applies federal law where "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

In reviewing the sufficiency of the evidence to support Riley's conviction, we may not assume the role of jurors and determine whether we believe that the evidence establishes Riley's guilt beyond a reasonable doubt. "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## B. Merits

### 1. *The Strickland Test*

In *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Supreme Court held that to prevail on an ineffective-assistance-of-counsel claim, a criminal defendant must show that his counsel was deficient and that this deficient representation prejudiced his defense. To satisfy the deficiency prong, the defendant must show that his "counsel's representation fell below an objective standard of reasonableness" as embodied in "prevailing professional norms." *Id.* at 687-88. With respect to the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### 2. *Strickland's Prejudice Prong Applied to the Facts Here*

The State does not concede that Riley satisfies the deficiency prong of the *Strickland* test, but it focuses its arguments on the prejudice prong. As an initial matter, the State contends that the district court misapplied the prejudice prong by improperly truncating its analysis of the trial evidence. The district court framed the issue as whether there is a reasonable probability that the outcome of Riley's trial would have been different if his counsel had moved for a directed verdict of acquittal at the close of the prosecution's case-in-chief. Instead, the State argues that under *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993), the district court was obligated to consider the trial evidence in its entirety and determine whether the allegedly deficient performance of Riley's counsel rendered the proceeding "fundamentally unfair" or "unreliable." Because the district court found that, with the addition of McKinney's testimony, there was sufficient evidence for the jury to conclude that Riley participated in Seaton's murder, the State argues that Riley cannot show that his trial was "fundamentally unfair" or "unreliable," and that he therefore cannot satisfy *Strickland's* prejudice prong. *Lockhart*, 506 U.S. at 369. Riley asserts that *Lockhart* has no bearing on the application of the *Strickland* prejudice prong here and that the district court properly concluded that the prejudice inquiry turned on what the evidence showed at the conclusion of the State's case-in-chief.

Ultimately, we need not decide whether or how *Lockhart* applies here because even considering only the evidence presented by the State in its case-in-chief, as Riley urges, and drawing all reasonable inferences in favor of the prosecution, we conclude that the jury could have found all the elements of the charged offense. *Jackson*, 443 U.S. at 319.

### *(a) Elements of the Offense of Aiding and Abetting Felony Murder Under Michigan Law*

The parties agree on the elements that must be proven to find a defendant guilty of felony murder on an aiding and abetting theory under Michigan law. First, to establish that a defendant aided and abetted a crime, a prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended to commit the crime at the time he gave aid and encouragement. *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999).

In addition, the elements of felony murder include (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of specified felonies. *Id.* at 136.

### (b) Sufficiency of the Evidence at the Close of the State's Case-in-Chief

The district court held that Riley satisfied the *mens rea* element of the crime of aiding and abetting felony murder because when Riley came out of the bathroom and saw Ware strangling Seaton, Riley "should have known from David Ware's actions that Ware possessed the requisite state of mind . . ." *Riley*, 388 F. Supp. 2d at 795-96. Thus, consistent with Michigan law, the district court determined that Riley possessed the requisite *mens rea* because Riley knew about Ware's intent to kill Seaton or cause Seaton great bodily harm. *See People v. Flowers*, 477 N.W.2d 473, 478 (Mich. Ct. App. 1991) (explaining that the prosecution must show that a defendant charged with felony murder on an aider and abettor theory "participated in a crime with knowledge of [the] principal's intent to kill or cause great bodily harm").

Nonetheless, the district court held that the State did not carry its evidentiary burden because it failed to show that Riley performed any acts in furtherance of Seaton's murder. *Riley*, 388 F. Supp. 2d at 796. The district court found that the evidence showed only that Riley was present at the scene and "watched as Ware choked Seaton." *Id.*; *see also People v. Norris*, 600 N.W. 2d 658, 663 (Mich. Ct. App. 1999) (stating that "[m]ere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime").

We disagree. A rational juror could have concluded that Riley participated in the murder on the basis of evidence establishing that Seaton had a muscular build, whereas neither Riley nor Ware did, and on the basis of evidence showing that Riley acted alongside Ware in committing larceny.

First, in its case-in-chief, the State presented witnesses who testified that Seaton was brawny in build. The medical examiner testified that Seaton was five feet, eight inches tall, two-hundred twenty-seven pounds, and "was a rather large framed muscular individual." J.A. at 143. Officer Tucker testified that Seaton had a "[p]retty heavy buil[d]." *Id.* at 82. Regina Lemay Wallace, an apartment resident, described Seaton as "thick." *Id.* at 167. In contrast, the witnesses who saw Riley and Ware at the apartment building on the day of the murder described the two as having thin, slight builds. These witnesses told the police that one perpetrator was five feet, eight inches tall and one-hundred forty pounds and the other perpetrator was five feet, five inches tall and one-hundred thirty-five pounds. Riley did not present any evidence contradicting these measurements. Thus, the evidence before the jury established that Seaton was the same height as, or just a few inches taller than, his assailants, but that he was nearly one-hundred pounds heavier than them, and that this weight was in the form of muscle. The jury could have reasonably inferred that given the disparity in size and strength between Seaton and Riley and Ware, it would have required the efforts of both Riley and Ware to subdue Seaton.

The jury also could have concluded that Riley must have assisted Ware where Seaton was strangled to death without any of Seaton's neighbors being alerted to a disturbance occurring within his apartment and without any evidence that Seaton vigorously resisted his assailants. Samuel Butler, who occupied the apartment next door to Seaton's and had his door open, did not hear any sounds of a struggle emanating from Seaton's apartment; indeed, there is no evidence that any of the other apartment residents heard any unusual noises. Moreover, the medical examiner testified that Seaton's body did not bear any abrasions or bruises consistent with a struggle. Although Gloria Hollis sensed that something was awry, her concerns were based on the unexpected presence and behavior of Riley and Ware when they answered Seaton's door, not on any signs of distress that

preceded her knocking. A rational juror could have inferred that the most likely explanation for the apparent ease with which Seaton was incapacitated is that he was quickly overwhelmed by the combined efforts of Ware and Riley.

Furthermore, witnesses testified that Seaton's wrists and ankles were bound in duct tape and telephone cord. Even if the jury believed Riley's story that he came out of the bathroom and discovered that Ware had Seaton in a sleeper hold, the jury could have reasonably disbelieved Riley's further assertion that he stood silent and inert as Ware finished strangling Seaton into unconsciousness and then tied him up. Under Riley's version of events, he did nothing while Ware, all by himself, (1) rendered Seaton unconscious, (2) retrieved the duct tape and bound Seaton's wrists and ankles, (3) pulled the telephone out of the wall and used the cord to further tie up Seaton, and accomplished all this before Seaton began to regain consciousness. The jury could have regarded this as an implausible scenario.

Second, the evidence presented by the State in its case-in-chief was sufficient to permit the jury to convict Riley on the theory that he and Ware were operating out of a common scheme to steal from Seaton. The apartment residents who discovered Seaton's lifeless body testified that his apartment looked "ransacked." Furnishings were out of place and dresser and cabinet doors were open, giving rise to the inference that the perpetrators searched Seaton's apartment for items of value. Moreover, witnesses saw Ware and Riley attempt to start Seaton's car and Riley admitted that he took Seaton's stereo mixer and Ware took Seaton's turntable and VCR.

Riley argues that there is no evidence establishing that he and Ware concocted a plan to steal from Seaton and that Seaton's death occurred as a consequence of this joint scheme. Rather, Riley maintains, and the district court agreed, that the evidence shows that the larceny was a crime of opportunity, not planned at all but merely occasioned by Seaton's death. Further, Riley argues that a fair reading of the evidence leads to the conclusion that Ware strangled Seaton in retaliation for an unwanted sexual advance, not to immobilize Seaton in order to steal his belongings.

We cannot say that the evidence does not support Riley's theory of the crime, nor can we say that it would have been unreasonable for the jury to conclude that the evidence did not establish that Seaton's murder was within the scope of a common plan to commit larceny. Nonetheless, the evidence also supports the opposite conclusion, and under *Jackson*, we must draw all reasonable inferences in favor of the jury's verdict.

As the State points out, Riley and Ware worked cooperatively in several critical respects: They arrived at Seaton's together, they were observed removing goods from Seaton's apartment and attempting to start his car together, and they fled the scene together. A rational juror could have concluded that this cooperative behavior signaled that the two were acting in accordance with a pre-conceived plan to steal from Seaton.

In addition, security guard Thomas testified that he saw Ware and Riley run down the alley away from Seaton's apartment building and that Ware got into a stopped car and drove off. The jury could have believed that the apparently waiting car was pre-arranged, thus giving rise to the inference that Ware and Riley formed a plan to steal from Seaton. Even though Riley did not get into the car, the jury could have viewed his separate escape as consistent with a plan to steal from Seaton insofar as Riley and Ware may have intended to split up after the crime to decrease their chances of apprehension.

Finally, if the jury believed that Riley must have assisted in subduing Seaton, given Seaton's size and the lack of evidence that he was able to fight back, then it could have concluded that Riley's motivation for rendering such assistance was to carry out his and Ware's plan to steal from Seaton.

For the reasons discussed above, we conclude that the State adduced sufficient evidence from which the jury could have inferred that Riley participated in Seaton's murder based on Seaton's muscular build, and Riley's participation in the larceny. Accordingly, we do not reach the further issue identified by the State and adopted by the Michigan Supreme Court, that Riley participated in Seaton's murder by preventing Gloria Hollis from learning Seaton's true condition when she knocked on the door. *Riley*, 659 N.W. 2d at 614.

### III.  CONCLUSION

Riley cannot satisfy the prejudice prong of the *Strickland* ineffective-assistance-of-counsel test because he has not shown a reasonable probability that had his counsel moved for a directed verdict at the close of the State's case-in-chief, the motion would have been granted. Therefore, the Michigan Supreme Court did not unreasonably apply federal law in denying Riley relief. The contrary judgment of the district court is **REVERSED** and the case is **REMANDED** to the district court for entry of an appropriate order.